IN THE SUPREME COURT OF NORTH CAROLINA

 2022-NCSC-11

 No. 101PA15-3

 Filed 11 February 2022

 STATE OF NORTH CAROLINA

 v.
 CHRISTOPHER ANTHONY CLEGG

 On discretionary review pursuant to N.C.G.S. § 7A-31 of an order entered on

 15 July 2019 by Judge Paul Ridgeway in Superior Court, Wake County, based on this

 Court’s 14 August 2018 Order, 371 N.C. 443, (2018), remanding the case to the trial

 court in reconsideration of defendant’s Batson challenge and retaining jurisdiction.

 On 26 February 2020, the Supreme Court allowed in part defendant’s supplemental

 petition for discretionary review. Heard in the Supreme Court on 6 October 2021.

 Joshua Stein, Attorney General, by Amy Kunstling Irene, Special Deputy
 Attorney General for the State-appellee.

 Dylan J.C. Buffum Attorney at Law, PLLC, by Dylan J.C. Buffum, for
 defendant-appellant.

 HUDSON, Justice.

¶1 Over 140 years ago, the Supreme Court of the United States held that

 exclusion of African Americans from juries on the basis of race violates the Equal

 Protection Clause of the Fourteenth Amendment of the United States Constitution.

 Strauder v. West Virginia, 100 U.S. 303, 310 (1880). Just over a century later, in
 STATE V. CLEGG

 2022-NCSC-11

 Opinion of the Court

 Batson v. Kentucky, that same Court established a three-step process through which

 courts analyze claims of racial discrimination in jury selection. 476 U.S. 79, 96–98

 (1986); see Foster v. Chatman, 578 U.S. 488, 499–500 (2016) (summarizing the Batson

 process). Today, we must decide whether the prosecutor’s exclusion of an African-

 American potential juror constitutes a substantive violation of the defendant’s

 constitutional right to equal protection under Batson when the trial court found that

 “both race-neutral justifications offered by the prosecutor fail.” We hold that it does,

 and therefore reverse the ruling of the trial court below, vacate defendant’s

 conviction, and remand the case back to the trial court for any further proceedings.

 I. Background

 A. Jury Selection and Trial

¶2 On 8 April 2014, defendant Christopher A. Clegg, an African-American man,

 was indicted for robbery with a dangerous weapon and possession of a firearm by a

 felon. Beginning on 4 April 2016, defendant was tried by a jury in Wake County

 Superior Court, Judge Paul C. Ridgeway presiding. During jury selection, defense

 counsel raised a challenge under Batson v. Kentucky (Batson challenge) after the

 prosecutor used peremptory strikes to remove two African-American women from the

 jury: Viola Jeffreys and Gwendolyn Aubrey. 476 U.S. 79. In response, the prosecutor

 proffered race-neutral reasons for the strikes. Specifically, the prosecutor asserted

 that he struck Ms. Jeffreys and Ms. Aubrey “based on their body language[] and . . .
 STATE V. CLEGG

 2022-NCSC-11

 Opinion of the Court

 their failure to look at me when I was trying to communicate with them.” The

 prosecutor also claimed that he struck Ms. Jeffreys due to potential bias toward

 defendant arising from her previous employment at Dorothea Dix Hospital, and that

 he struck Ms. Aubrey due to her answer of “I suppose” in response to a question

 asking whether she could be fair and impartial. Defense counsel then argued that

 these reasons were pretextual. The trial court subsequently ruled that defendant had

 failed to establish that race was a significant factor in the peremptory strikes, and

 therefore overruled his Batson challenge. After the completion of jury selection and

 the resolution of a few other preliminary issues, the case proceeded to trial.

¶3 At trial, the State’s evidence, as presented through several witnesses and

 exhibits, tended to show that in the early morning hours of 25 January 2014,

 defendant, brandishing a gun, robbed a sweepstakes business located at the Timber

 Landing Business Center in Garner, North Carolina. Defendant neither testified nor

 offered witnesses or evidence of his own at trial. On 6 April 2016, the jury found

 defendant guilty of robbery with a dangerous weapon and not guilty of possession of

 a firearm by a felon. Defendant was sentenced to a term of sixty-six to ninety-two

 months’ imprisonment, with credit for 767 days of pre-trial incarceration. On 8 April

 2016, defendant appealed his conviction to the North Carolina Court of Appeals.

 B. Court of Appeals

¶4 On appeal, defendant raised two issues. First, he argued that the trial court
 STATE V. CLEGG

 2022-NCSC-11

 Opinion of the Court

 erred by overruling his Batson challenge. Second, he argued that the trial court erred

 by admitting prejudicial victim impact testimony in violation of Rules 401, 402, and

 403 of the North Carolina Rules of Evidence. The State contended that the trial court

 had acted properly on both issues.

¶5 On 5 September 2017, in a unanimous, unpublished opinion, the Court of

 Appeals rejected both of defendant’s arguments. State v. Clegg, 2017 WL 3863494

 (N.C. Ct. App. Sept. 5, 2017) (unpublished). First, the Court of Appeals considered

 defendant’s Batson challenge. The court first summarized the three-step process of a

 Batson challenge:

 First, the defendant must make a prima facie
 showing that the state exercised a race-based
 peremptory challenge. If the defendant makes
 the requisite showing, the burden shifts to the
 state to offer a facially valid, race-neutral
 explanation for the peremptory challenge.
 Finally, the trial court must decide whether
 the defendant has proved purposeful
 discrimination.

 Clegg, 2017 WL 3863494 at *2 (citing State v. Taylor, 362 N.C. 514, 527 (2008), cert.

 denied, 558 U.S. 851 (2009)). The Court of Appeals noted, though, that “[o]nce a

 prosecutor has offered a race-neutral explanation for the peremptory challenges and

 the trial court has ruled on the ultimate question of intentional discrimination, the

 preliminary issue of whether the defendant has made a prima facie showing becomes

 moot.” Id. (citing State v. Bell, 359 N.C. 1, 12 (2004)).
 STATE V. CLEGG

 2022-NCSC-11

 Opinion of the Court

¶6 The Court of Appeals then reviewed the trial court’s handling of defendant’s

 Batson challenge. “Because the trial court heard the State’s reasons for striking

 Jeffreys and Aubrey prior to making a ruling on defendant’s Batson objections,” thus

 rendering the preliminary issue of defendant’s prima facie case moot for Batson

 purposes, the Court of Appeals moved directly to step two: reviewing the prosecution’s

 proffered reasons for the peremptory strikes. Id. at *3. As a preliminary matter, the

 court “note[d] that there is a discrepancy between the State’s characterization of its

 voir dire of Aubrey and what the transcript reveals.” Id. at *4. Specifically, the court

 noted that while the prosecutor’s given rationale for striking Ms. Aubrey claimed that

 she had answered “I suppose” to a question about whether she could be fair and

 impartial, the transcript reveals that she actually gave that answer to a question

 about whether she was confident that she would be able to focus on the trial.

 Consequently, the court “review[ed] the State’s argument in light of this

 clarification.” Id. The court subsequently ruled that “[t]he State’s concerns of both

 Jeffreys’ and Aubrey’s failure to make eye contact and their ability to be fair and

 focused on the trial constitute neutral explanations for each peremptory strike.”

 Accordingly, the court found “no discriminatory intent inherent in the State’s

 explanations and thus agree[d] with the trial court’s determination that the State’s

 justifications were race neutral.” Id.

¶7 The Court of Appeals then “move[d] to the third step of the Batson inquiry and
 STATE V. CLEGG

 2022-NCSC-11

 Opinion of the Court

 consider[ed] whether the trial court erred by finding that there was no Batson error.”

 Id. at *11. Here, the court noted defendant’s argument that the proffered reasoning

 regarding Aubrey’s ability to focus was revealed as pretextual because a white juror,

 David Williams, also indicated that he might be distracted from the trial due to work

 concerns. But “[t]he distinguishing factor between Aubrey and David Williams[,]” the

 court ruled, “appears to be the State’s additional stated bases for striking Aubrey[:]

 . . . her body language and failure to make eye contact.” Id. The court likewise

 dismissed defendant’s argument that the prosecutor’s proffered reasoning for striking

 Ms. Jeffreys―her previous employment at Dorothea Dix, a psychiatric hospital―was

 pretextual. Specifically, the court ruled that because “there was a competency

 evaluation of defendant ordered and defense counsel stated that she had also

 requested an in-custody evaluation of the defendant[,] . . . the State’s basis for striking

 Jeffreys due to her work history is rationally related to defendant’s potential

 competency issues.” Id. “Moreover, [the court] note[d,] . . . the State explained that it

 also exercised its peremptory strike on Jeffreys based on her body language and

 failure to make eye contact.” Id. “As such,” the court found that “defendant has failed

 to carry his burden of proving purposeful discrimination[,]” and therefore held that

 “defendant’s Batson challenge was properly denied.” Id. at *6.

¶8 Second, the Court of Appeals likewise ruled that the trial court did not commit

 plain error by admitting the victim impact testimony of Patrice Williams, who was
 STATE V. CLEGG

 2022-NCSC-11

 Opinion of the Court

 present at the robbery. Id. at *6–7. Because defendant does not raise this issue before

 this Court, we do not consider it further here. In sum, the Court of Appeals held that

 the trial court committed no error. Id. at *7.

 C. Special Order and Batson Rehearing

¶9 On 10 October 2017, defendant filed a notice of appeal with this Court under

 N.C.G.S. § 7A-30(1), asserting that the case presented a substantial constitutional

 question under the Equal Protection Clause of the U.S. Constitution and Article I

 Sections 19 (equal protection) and 26 (jury service) of the North Carolina

 Constitution. In response, the State filed a motion to dismiss defendant’s appeal for

 lack of a substantial constitutional question. Also on 10 October 2017, defendant filed

 a petition for discretionary review with this Court under N.C.G.S. § 7A-31(c),

 asserting that the case fulfilled all three of the statutory bases for discretionary

 review: (1) significant public interest; (2) legal principles of major significance to the

 jurisprudence of the State; and (3) conflict with a decision of the Supreme Court. In

 both the notice of appeal and petition for discretionary review, defendant focused

 exclusively on the Batson challenge issue.

¶ 10 On 14 August 2018, this Court responded to defendant’s petition via special

 order. The order directed “that this case be remanded to the trial court for

 reconsideration of defendant’s Batson challenge based upon the existing record and

 the entry of a new order addressing the merits of defendant’s Batson challenge in
 STATE V. CLEGG

 2022-NCSC-11

 Opinion of the Court

 light of the United States Supreme Court decision in Foster v. Chatman, [578] U.S.

 [488], 136 S. Ct. 1737, 195 L. Ed. 1 (2016), which was decided after the trial court’s

 decision in this case.” 371 N.C. 443 (2018). The order further instructed that “[a]fter

 the entry of the order on remand, the trial court should certify that order to this

 Court, which retains jurisdiction and will undertake any necessary additional

 proceedings at that time.” That same day, this Court allowed the State’s motion to

 dismiss defendant’s notice of appeal.

¶ 11 On 17 December 2018, in accordance with this Court’s order, the trial court

 held a new hearing regarding defendant’s Batson challenge. Judge Ridgeway, the

 same judge as at the initial trial, also presided over this new Batson hearing. In

 briefing and at the hearing, defense counsel (different from original trial) and the

 prosecutor (same as at original trial) presented arguments regarding the application

 of the U.S. Supreme Court’s ruling in Foster to defendant’s Batson challenge.

¶ 12 First, defense counsel argued that two findings from Foster “are especially

 important in this case”: (1) “that when a prosecutor mischaracterizes a juror’s

 answers, this is strong evidence that the justification is, in fact, pretext[;]” and (2)

 “that in order to prevail in step three of Batson, the defendant does not need to

 disprove each and every reason given by the prosecutor.”

¶ 13 Both of these elements, defense counsel argued, relate directly to the State’s

 striking of Ms. Aubrey. First, as noted by the Court of Appeals, defense counsel
 STATE V. CLEGG

 2022-NCSC-11

 Opinion of the Court

 argued that the prosecutor repeatedly mischaracterized Ms. Aubrey’s answers by

 claiming that she answered “I suppose” to a question about whether she could be fair

 and impartial, when she actually gave that answer to a question about whether she

 was confident that she would be able to focus at trial. Second, defense counsel argued

 that because the prosecutor’s first justification for the strike was shown to be

 pretextual, defendant did not need to undermine every other reason provided by the

 prosecutor, including body language and lack of eye contact. Further, defense counsel

 sought to undermine the prosecutor’s reliance on body language and eye contact

 because defense counsel at trial disputed those findings and the trial court made no

 contemporary findings of their veracity.

¶ 14 Next, defense counsel argued that the prosecution’s proffered reasons for

 striking Ms. Jeffreys likewise fall short. Regarding the prosecutor’s “body language

 and eye contact” reasoning, defense counsel noted that the prosecutor always referred

 to Ms. Aubrey and Ms. Jeffreys collectively when discussing body language, never

 distinguishing between the two Black women and never offering more specific details

 about what exactly was troubling to him about their body language. Regarding the

 Dorothea Dix reasoning, defense counsel argued that “[i]f the prosecutor [was]

 genuinely concerned about [jurors’] experience with mental health being a

 disqualifying factor for him in making his peremptory strikes[,] . . . he would have

 asked at least one other juror [about it].”
 STATE V. CLEGG

 2022-NCSC-11

 Opinion of the Court

¶ 15 Finally, defense counsel emphasized the burden of proof in a Batson challenge:

 “the defendant needs to show…that it is more likely than not that race was a

 substantial motivating factor for the strike[,]” not the sole reason for the strike. Based

 on the evidence presented that the prosecutor’s proffered reasons were pretextual,

 defense counsel argued that defendant had met that burden.

¶ 16 In response, the prosecutor argued that his proffered race-neutral reasons for

 the peremptory strikes of Ms. Aubrey and Ms. Jeffreys pass Batson scrutiny. First,

 the prosecutor noted “some very obvious distinctions between the record here and the

 Foster case,” namely: (1) that the victim and witnesses here are also African

 American; (2) that the jury here included one juror who identified as mixed race

 (African-American father and Chinese mother); and (3) that the prosecutor here did

 not blatantly and persistently focus on race during jury selection.

¶ 17 Next, the prosecutor repeated his proffered race-neutral reasons for striking

 Ms. Jeffreys and Ms. Aubrey. Regarding Ms. Jeffreys, the prosecutor argued that

 because defendant’s “mental health was an underlying issue and concern for the

 defense,” Jeffreys’s experience as a nurse to mental health patients may render her

 “sympathetic to the Defendant despite overwhelming evidence of his guilt.” The

 prosecutor further noted that while all of the potential jurors were asked about their

 occupation, “Ms. Jeffreys was the only one who said she worked or used to work in

 the mental health field.”
 STATE V. CLEGG

 2022-NCSC-11

 Opinion of the Court

¶ 18 Regarding Ms. Aubrey, the prosecutor again noted “her body language and her

 lack of eye contact.” He then emphasized that her short and equivocal answers of “I

 suppose” and “I think so” to his questions about her ability to focus on the trial created

 concern regarding “whether or not she could be an engaged juror throughout this

 process.”

¶ 19 Then, the prosecutor addressed his initial mistake regarding to which question

 Ms. Aubrey had answered “I suppose”:

 . . . Your Honor, I’ll be the first to tell you that this is the
 first and only time . . . I’ve had to address [a Batson]
 challenge. And I was completely flustered when this was
 brought up during trial. And it did cause me to misspeak
 with respect to the answer or the question that Ms. Aubrey
 was answering. And as [defense counsel] pointed out from
 the record, as part of my race neutral justification for Ms.
 Aubrey, I said when I asked her if she could be fair and
 impartial, her answer was “I suppose.”. . . I wasn’t
 confident that she was confident that she could be fair and
 impartial. And that’s—that’s the State misspeaking. That
 is a product of simply getting confused. That’s a standard
 question I ask during jury selection; can somebody be fair
 and impartial. And I also ask can people focus on the
 proceedings. And that was simply confusing those
 questions and her answer.

¶ 20 Later, when addressing this same mistake, the prosecutor and the trial court

 had the following exchange:

 The [c]ourt: I think it’s more misremembering than
 misspeaking. That’s all right.

 Mr. Wiggs: Right.
 STATE V. CLEGG

 2022-NCSC-11

 Opinion of the Court

 The [c]ourt: I mean, I think you don’t—taking it in the light
 most favorable to you or to the prosecutor—were you the
 prosecutor?

 Mr. Wiggs: I was.

 The [c]ourt: Okay. Then taking it in the light most
 favorable, you didn’t remember that the answer was given
 to another question rather than this question. So it’s not
 misspeaking, it’s misremembering.

¶ 21 Finally, the prosecutor noted several previous cases from this Court, the Court

 of Appeals, and the U.S. Supreme Court, emphasizing the low bar that prosecutors

 must meet in responding to a Batson challenge, and the wide variety of race-neutral

 reasons that may suffice in meeting that bar. Concluding, the prosecutor asked the

 trial court to again deny defendant’s Batson challenge.

¶ 22 On 15 July 2019, the trial court issued its new order on defendant’s Batson

 challenge. As requested, the court considered the race-neutral justifications offered

 by the prosecutor for the two peremptory strikes in question in light of Foster, noting

 that “[t]he Constitution forbids striking even a single prospective juror for a

 discriminatory purpose.”

¶ 23 First, the trial court reviewed the prosecutor’s strike of Ms. Jeffreys. The court

 found that the prosecutor’s reasoning regarding Jeffreys’s previous employment at

 Dorothea Dix Hospital “is supported by the record and constitutes an appropriate

 reason for the strike.”

¶ 24 Second, the trial court reviewed the prosecutor’s strike of Ms. Aubrey. Here,
 STATE V. CLEGG

 2022-NCSC-11

 Opinion of the Court

the court addressed the discrepancy between the prosecutor’s stated reasoning and

the record regarding Ms. Aubrey’s “I suppose” answer:

 7. It is evident from the record that both the trial court’s
 and the prosecutor’s memory of the answers given by Ms.
 Aubrey was conflated. She did not say “I suppose” in
 response to a question of whether she could be “fair and
 impartial.” Rather, in answering a question from the
 [c]ourt as to whether there was “anything going on in your
 life that would make it difficult or impossible for you to
 serve,” Ms. Aubrey said “other than missing work, no.” The
 [c]ourt then inquired whether Ms. Aubrey worked
 “daytime,” and Ms. Aubrey responded “day and night.”
 Shortly thereafter, the prosecutor asked Ms. Aubrey the
 following questions:

 Prosecutor: Okay. Ms. Aubrey, do you feel confident you can
 focus on what’s going on here?

 Ms. Aubrey: I suppose.

 Prosecutor: I want you to be confident about it. You just
 don’t want to be a juror, or do you feel like if you were here,
 you could focus and do what we need you to do?

 Ms. Aubrey: I think so.

 8. In retrospect, had the prosecutor, in offering his race-
 neutral basis for exercising the strike of Ms. Aubrey, stated
 that he was concerned that she had answered “I suppose”
 to the question of whether she could focus, when coupled
 with her concern that she worked “day and night” and
 would miss work, that, in the [c]ourt’s view, would have
 constituted a neutral justification for the strike.

 9. However, as it stands, the State’s offered reason for
 striking Ms. Aubrey based on her “I suppose” answer is not
 supported by the record because the prosecutor associated
 that answer with whether she could be “fair and impartial,”
 STATE V. CLEGG

 2022-NCSC-11

 Opinion of the Court

 not whether she could focus.

 10. The Foster Court instructs that when reasons that are
 offered by a prosecutor as a basis for exercising a strike
 contradict or mischaracterize the record, those reasons
 must be rejected in evaluating whether race was a
 motivating factor in exercising a strike. Foster, supra, at
 1750 (prosecutor’s reasons were “contradicted by the
 record”); 1753 (prosecutor’s justifications were
 “mischaracterization of the record”); 1753 (“[m]any of the
 State’s secondary justifications similarly came undone
 when subjected to scrutiny”).

 11. Moreover, a trial court is not permitted to consider race-
 neutral reasons for exercising a strike that are not
 articulated by the prosecutor. Miller-El v. Dretke, 545 U.S.
 231, 250–52 (2005) (“If the stated reason does not hold up,
 its pretextual significance does not fade because a trial
 judge, or an appeals court, can imagine a reason that might
 not have been shown up as false. The Court of Appeals’s
 and the dissent’s substitution of a reason for eliminating
 Warren does nothing to satisfy the prosecutors’ burden of
 stating a racially neutral explanation for their own
 actions.”)

 12. Strict application of the rules articulated in Foster and
 Miller-El to the race-neutral (but mis-remembered)
 reasons provided by the prosecutor justifying Ms. Aubrey’s
 strike would require the [c]ourt to exclude and not consider
 the reason articulated by the prosecutor – that Ms. Aubrey
 said that “she supposed” she could be fair and impartial –
 because that reason is contradicted by the record.

¶ 25 After thus rejecting the “I suppose” rationale for Ms. Aubrey’s strike, the trial

 court then considered “the only [remaining] race-neutral reason articulated by the

 prosecutor[:] . . . the ‘body language’ and ‘lack of eye contact’ rationale.” Here, the

 court noted that “[t]he ‘body language’ rationale was disputed by trial counsel for the
 STATE V. CLEGG

 2022-NCSC-11

 Opinion of the Court

 defendant, and the trial court made no specific findings regarding Ms. Aubrey’s body

 language or demeanor.” The court then noted that this “circumstance is similar to

 one that arose in Snyder v. Louisiana, 552 U.S. 472 (2008),” in which the U.S.

 Supreme Court rejected the validity of a peremptory strike of an African-American

 juror on the basis of alleged “nervousness” when “the record does not show that the

 trial judge actually made a determination concerning [the potential juror’s]

 demeanor.” Snyder, 552 U.S. at 479. “Hence,” the trial court stated, “without findings

 of fact by the trial court, the Snyder Court appears to instruct that for appellate

 purposes the ‘body language’ race-neutral justification offered by the prosecutor

 cannot be viewed as sufficient.” “As such,” the trial court ruled, “both race-neutral

 justifications offered by the prosecutor fail—one because the prosecutor mis-

 remembered the question to which Ms. Aubrey responded ‘I suppose,’ and the other

 because the trial court failed to make sufficient findings of fact to establish a record

 of Ms. Aubrey’s body language.”

¶ 26 Next, the trial court reviewed the arguments presented by defendant that the

 State’s peremptory strikes constitute a Batson violation. First, the court noted

 defendant’s statistical evidence regarding jury selection in this case. Specifically, the

 court observed:

 Three of the 22 venire members were non-white. The
 prosecutor used 4 of 7 peremptory strikes allotted to each
 party by statute. Among those venire members whom the
 State struck, 2 were African[-]American women. Hence,
 STATE V. CLEGG

 2022-NCSC-11

 Opinion of the Court

 the State struck 2 of the 3 non-white members of the
 venire, which also turned out to be all the non-white female
 venire members. The remaining two peremptory strikes
 exercised by the State were of white males.

¶ 27 The trial court then considered “[t]he evidence proffered by the [d]efendant

 relating to statewide disparities in the exercise of peremptory challenges[.]”

 Specifically, the court observed “that in non-capital cases studied from 2011-2012,

 [North Carolina] prosecutors struck black venire members at about twice the rate of

 white” (citing D. Pollitt & B. Warren, Thirty Years of Disappointment: North

 Carolina’s Remarkable Appellate Batson Record, 94 N.C. L. Rev. 1957, 1964 (2016)).

¶ 28 Next, the trial court considered defendant’s side-by-side comparison of the

 questioning of white and Black potential jurors regarding their ability to focus during

 trial. Specifically, regarding the allegedly disparate questioning of Mr. David

 Williams and Ms. Aubrey on this issue, the court “[did] not find this side-by-side

 comparison particularly pertinent because Mr. Williams had previously stated that,

 with respect to his supervisory duties, ‘I can juggle things around,’ whereas Ms.

 Aubrey did not indicate any flexibility in her ‘day and night’ work schedule that might

 ease her concern about missing work.”

¶ 29 Finally, the trial court turned to the third step of the Batson analysis:

 “determin[ing] whether the defendant has shown purposeful discrimination”

 (internal citation omitted). Again, the trial court ruled that “[d]efendant has shown

 that the race-neutral justifications offered by the prosecutor cannot be supported by
 STATE V. CLEGG

 2022-NCSC-11

 Opinion of the Court

 the record—either because the prosecutor mis-remembered the potential juror’s

 answer or because the trial court failed to make an adequate record of the body

 language of the prospective juror.” Further, the court noted that “[t]he [d]efendant

 has also shown evidence of statistical disparities in the exercise of peremptory

 challenges by prosecutors in statewide jury selection studies in data collected from

 1990 to 2012.”

¶ 30 The trial court then stated its ultimate conclusion:

 However, the [c]ourt cannot conclude from this record that
 in this case, the State has engaged in “purposeful
 discrimination.” As the [d]efendant points out, the
 applicable standard is, given all relevant circumstances,
 “whether it was more likely than not that the challenge
 was improperly motivated.” Johnson v. California, 545
 U.S. 162, 170 (2005). Even on this relaxed “more likely
 than not” standard, this [c]ourt concludes that essential
 evidence of purposeful discrimination—which is the
 [d]efendant’s burden to prove—is lacking.

¶ 31 In support of this conclusion, the trial court noted that “[t]he cases in which

 the [U.S.] Supreme Court has found that the state exercised peremptory challenges

 in a purposefully discriminatory fashion are strikingly different from the case at

 hand.” By way of example, the court noted that both Foster and Miller-El included

 glaring evidence of racial discrimination by prosecutors, including: (1) a finding that

 the prosecutor’s explanations were “misrepresentations” and “contradicted by the

 record,” Foster, 578 U.S. at 505; (2) “a jury list . . . found in the prosecutor’s file with

 each black prospective juror highlighted in bright green,” id. at 1744; (3) Black
 STATE V. CLEGG

 2022-NCSC-11

 Opinion of the Court

 prospective jurors being subjected to a “trick question” that was not asked of white

 prospective jurors, Miller-El, 545 U.S. at 255; and (4) “a specific policy [in the

 prosecutor’s office] of systematically excluding blacks from juries” evidenced by a

 training manual that “outlined the reasoning for excluding minorities from jury

 service.” Id. at 266.

¶ 32 By comparison, the trial court found “this case . . . markedly distinguishable

 from the facts of this controlling authority.” Specifically, the court noted:

 Unlike that authority, here the direct evidence of
 purposeful discrimination is not a “mischaracterization” of
 the record with “no grounding in fact.” Rather, it appears
 to be an instance of a prosecutor mis-remembering whether
 the prospective juror had said “I suppose” in responding to
 a question of whether she could be fair and impartial, or
 whether she could focus given her “day and night”
 employment and concern about missing work. And, unlike
 the controlling authority, no evidence has been presented
 of a systemic policy of the prosecutor’s office to exclude
 black jurors, or of a trial strategy in this specific case to
 exclude black jurors. In other words, the [c]ourt concludes
 that the quantum of evidence in this case, both direct and
 circumstantial, is insufficient to support the conclusion
 that the prosecutor engaged in purposeful discrimination
 by excluding 2 of 3 non-white jurors.

¶ 33 Therefore, the trial court concluded “that defendant has not established that it

 is more likely than not that the State engaged in purposeful discrimination in

 excluding prospective jurors Jeffreys and Aubrey[.]” Accordingly, “the [c]ourt again

 order[ed] that [d]efendant’s Batson objections must be OVERRULED.” Finally, in

 accordance with this Court’s 14 August 2018 Order, the trial court forwarded its order
 STATE V. CLEGG

 2022-NCSC-11

 Opinion of the Court

 to this Court for further proceedings.

¶ 34 On 23 August 2019, defendant filed a supplementary petition for discretionary

 review with this Court based on the trial court’s rehearing order. In this petition,

 defendant argued that this Court should “summarily reverse the trial court’s order,

 vacate the judgments and order a new trial because the record unequivocally

 demonstrates that the State failed to meet [its] burden to proffer a race neutral

 reason” for its peremptory strike of Ms. Aubrey. Alternatively, defendant argued that

 “this Court should certify the decision below for plenary review because this case

 presents important principles of Batson jurisprudence” and “presents the perfect

 vehicle to review the appropriate standard [for] evaluating the evidence at trial and

 [the] standard of review on appeal.” On 26 February 2020, this Court denied

 defendant’s request for summary reversal but allowed his petition “for the purpose of

 affording plenary review of the issues raised in that petition.”

¶ 35 Before this Court, defendant argued that the trial court erred in finding that

 he “failed to meet his burden to show purposeful discrimination because the State

 failed to articulate a reason for the peremptory strikes of Black jurors that was

 legitimate, facially valid[,] reasonably specific[,] or related to the case to be tried.”

 Defendant further contended that the trial court clearly erred by “viewing the

 evidence in the light most favorable to the state,” and ignoring or justifying evidence

 from which improper discriminatory intent could be inferred.
 STATE V. CLEGG

 2022-NCSC-11

 Opinion of the Court

¶ 36 In response, the State argued that: (1) it had given facially valid, race-neutral

 reasons for its peremptory challenges at step two of the Batson test; and (2) the trial

 court did not clearly err at step three of the Batson test by overruling defendant’s

 Batson objection. The parties elaborated upon these points at oral arguments before

 this Court on 6 October 2021.

 II. Analysis

¶ 37 Now, we must consider whether the trial court’s ruling regarding defendant’s

 Batson challenge was clearly erroneous. See Snyder, 552 U.S. at 477 (“On appeal, a

 trial court’s ruling on the issue of discriminatory intent must be sustained unless it

 is clearly erroneous”); State v. Chapman, 359 N.C. 328, 339 (2005) (“Thus, the

 standard of review is whether the trial court’s [Batson] findings are clearly

 erroneous”). Such “clear error” is “deemed to exist when, on the entire evidence[,] the

 Court is left with the definite and firm conviction that a mistake has been committed.”

 State v. Bennett, 374 N.C. 579, 592 (2020) (cleaned up). In order to make this

 determination, we first summarize the applicable history and precedent regarding

 racial discrimination in jury selection and Batson challenges.

 A. Batson History and Precedent

¶ 38 Juries are at the heart of our constitutional democracy. See U.S. Const. amend.

 VI (establishing the right to a jury in criminal trials); U.S. Const. amend VII

 (establishing the right to a jury in civil suits); Duncan v. Louisiana, 391 U.S. 145, 149
 STATE V. CLEGG

 2022-NCSC-11

 Opinion of the Court

 (1968) (noting “that trial by jury in criminal cases is fundamental to the American

 scheme of justice . . .”). Principally, juries “safeguard[] a person accused of crime

 against the arbitrary exercise of power by a prosecutor or judge.” Batson, 476 U.S. at

 86 (citing Duncan, 391 U.S. at 156). More broadly, though, jury service also “affords

 ordinary citizens a valuable opportunity to participate in a process of government, an

 experience fostering, one hopes, a respect for law.” Powers v. Ohio, 499 U.S. 400, 407

 (1991) (citing Duncan, 391 U.S. at 187 (Harlan, J., dissenting)). “Indeed, with the

 exception of voting, for most citizens the honor and privilege of jury duty is their most

 significant opportunity to participate in the democratic process.” Id.

¶ 39 Because juries are so fundamental to our system, racial discrimination in jury

 selection is deeply harmful. “Purposeful racial discrimination in the selection of the

 venire . . . denies [a criminal defendant] the protection that a trial by jury is intended

 to secure.” Batson, 476 at 86; see also Miller-El, 545 U.S. at 237 (“Defendants are

 harmed, of course, when racial discrimination in jury selection compromises the right

 of trial by impartial jury.”). In addition to the defendant, such discrimination also

 harms the excluded juror, who is unduly denied the civic responsibility and

 opportunity of jury participation. See Batson, 476 U.S. at 87 (noting that “by denying

 a person participation in jury service on account of his race, the State

 unconstitutionally discriminated against the excluded juror”). Even more broadly,

 “[t]he harm from discriminatory jury selection extends beyond that inflicted on the
 STATE V. CLEGG

 2022-NCSC-11

 Opinion of the Court

 defendant and the excluded juror to touch the entire community.” Id. “That is, the

 very integrity of the courts is jeopardized when a prosecutor’s discrimination invites

 cynicism respecting the jury’s neutrality and undermines public confidence in

 adjudication.” Miller-El, 545 U.S. at 238 (cleaned up). In short, racial discrimination

 in jury selection “is at war with our basic concepts of a democratic society and a

 representative government.” Smith v. Texas, 311 U.S. 128, 130 (1940).

¶ 40 Accordingly, our courts have long sought to protect the sanctity of juries from

 the stain of racism. In 1880, the U.S. Supreme Court held that state laws limiting

 jury service to white men violate the Equal Protection Clause of the Fourteenth

 Amendment of the U.S. Constitution. Strauder, 100 U.S. at 310. Even after Strauder,

 though, “critical problems persisted.” Flowers v. Mississippi, 139 S. Ct. 2228, 2239

 (2019). Specifically, “[e]ven though laws barring blacks from serving on juries were

 unconstitutional after Strauder, many jurisdictions [still] employed various

 discriminatory tools to [exclude] black persons from . . . jury service.” Id.

¶ 41 Peremptory strikes were one such tool. See id. (“And when [other] tactics failed,

 or were invalidated, prosecutors could still exercise peremptory strikes in individual

 cases to remove most or all black prospective jurors.”). “Peremptory strikes have very

 old credentials . . . traced back to the common law[,]” and “traditionally may be used

 to remove any potential juror for any reason—no questions asked.” Id. at 2238. With

 this unquestioned discretion, though, also comes the potential for veiled
 STATE V. CLEGG

 2022-NCSC-11

 Opinion of the Court

 discrimination. See Miller-El, 545 U.S. at 238 (noting “the practical difficulty of

 ferreting out discrimination in selections [that are] discretionary by nature”). Indeed,

 “[i]n the century after Strauder, the freedom to exercise peremptory strikes for any

 reason meant that the problem of racial exclusion from jury service remained

 widespread and deeply entrenched[,]” putting the practice squarely in conflict with

 well-established principles of equal protection. Flowers, 139 S. Ct. at 2239 (cleaned

 up).

¶ 42 In Batson v. Kentucky, the U.S. Supreme Court resolved this conflict in favor

 of equal protection. 476 U.S. at 89 (holding that “the State’s privilege to strike

 individual jurors through peremptory challenges[] is subject to the commands of the

 Equal Protection Clause”). Specifically, the Court held that “[a]lthough a prosecutor

 ordinarily is entitled to exercise permitted peremptory challenges for any reason at

 all, . . . the Equal Protection Clause forbids the prosecutor to challenge potential

 jurors solely on account of their race.” Id. (cleaned up). And contrary to a previous

 ruling suggesting that proof of repeated strikes of Black prospective jurors over a

 number of cases was necessary to establish an equal protection violation, the Batson

 Court held that “a defendant may [show] purposeful racial discrimination in selection

 of the venire by relying solely on the facts concerning its selection in his case.” Id. at

 95; cf. Swain v. Alabama, 380 U.S. 202, 227 (1965) (establishing the systematic

 discrimination requirement overruled in Batson).
 STATE V. CLEGG

 2022-NCSC-11

 Opinion of the Court

¶ 43 The Batson Court further established a three-step process by which courts

 analyze claims of racially motivated peremptory strikes, now called “Batson

 challenges.” First, a defendant bringing a Batson challenge must “make out a prima

 facie case of purposeful discrimination by showing that the totality of the relevant

 facts gives rise to an inference of discriminatory purpose.” Batson, 476 U.S. at 93–94.

 “In deciding whether the defendant has made the requisite showing, the trial court

 should consider all relevant circumstances.” Id. at 96.

¶ 44 Second, “[o]nce the defendant makes a prima facie showing, the burden shifts

 to the State to come forward with a [race-]neutral explanation for challenging [the]

 jurors.” Id. at 97. Although there may be “any number of bases on which a prosecutor

 reasonably may believe that it is desirable to strike a juror who is not excusable for

 cause[,]. . . the prosecutor must give a clear and reasonably specific explanation of his

 legitimate reasons for exercising the challenges.” Id. at 98, n.20 (cleaned up).

¶ 45 Third, in light of both parties’ submissions, “[t]he trial court then [must]

 determine if the defendant has established purposeful discrimination.” Id. at 98. At

 this step, the judge must assess “whether the prosecutor’s proffered reasons are the

 actual reasons, or whether the proffered reasons are pretextual and the prosecutor

 instead exercised peremptory strikes on the basis of race.” Flowers, 139 S. Ct. at 2244.

¶ 46 In the years since Batson, the U.S. Supreme Court has further clarified each

 step of this framework. Several of these clarifications are pertinent to our analysis
 STATE V. CLEGG

 2022-NCSC-11

 Opinion of the Court

 here. Generally, “[t]he Constitution forbids striking even a single prospective juror

 for a discriminatory purpose.” Snyder, 552 U.S. at 478. Next, regarding a step one,

 defendants may “present a variety of evidence to support a claim that a prosecutor’s

 peremptory strikes were made on the basis of race[,]” including:

 statistical evidence about the prosecutor’s use of
 peremptory strikes against black prospective jurors as
 compared to white prospective jurors in the case; evidence
 of a prosecutor’s disparate questioning and investigation of
 black and white prospective jurors in the case; side-by-side
 comparisons of black prospective jurors who were struck
 and white prospective jurors who were not struck in the
 case; a prosecutor’s misrepresentations of the record when
 defending the strikes during the Batson hearing; relevant
 history of the State’s peremptory strikes in past cases; or
 other relevant circumstances that bear upon the issue of
 racial discrimination.

 Flowers, 139 S. Ct. at 2243 (cleaned up).

¶ 47 Regarding step two, the U.S. Supreme Court has noted that a prosecutor’s

 proffered reasoning need not be “persuasive, or even plausible. At this second step of

 the inquiry, the issue is only the facial validity of the prosecutor’s explanation. Unless

 a discriminatory intent is inherent in the prosecutor’s explanation, the reason offered

 will be deemed race neutral.” Purkett v. Elem, 514 U.S. 765, 768 (1995) (cleaned up).

 However, while a prosecutor may raise demeanor-based rationales for a peremptory

 strike, without “a specific finding [by the trial judge] on the record concerning [the

 potential juror’s] demeanor,” a reviewing court “cannot presume that the trial judge

 credited the prosecutor’s assertion [regarding the potential juror’s demeanor].”
 STATE V. CLEGG

 2022-NCSC-11

 Opinion of the Court

 Snyder, 552 U.S. at 479. Likewise, a prosecutor’s “shifting explanations” or

 “misrepresentations of the record” may be considered indications of pretext. Foster,

 578 U.S. at 512.

¶ 48 Finally, the U.S. Supreme Court has provided useful guidance for both trial

 courts engaging in Batson step three and for appellate courts reviewing Batson

 rulings. First, “in considering a Batson objection, or in reviewing a ruling claimed to

 be Batson error, [a court may consult] all of the circumstances that bear upon the

 issue of racial animosity.” Snyder, 552 U.S. at 478. Notably, Batson analysis “does

 not call for a mere exercise in thinking up any rational basis. If the stated reason does

 not hold up, its pretextual significance does not fade because a trial judge, or an

 appeals court, can imagine a reason that might not have been shown up as false.”

 Miller-El, 545 U.S. at 252. Next, appellate courts reviewing a trial court’s Batson

 ruling “need not . . . decide that any one [fact] alone would require reversal. All that

 [it] need[s] to decide . . . is that all of the relevant facts and circumstances taken

 together establish that the trial court . . . committed clear error in concluding that

 the State’s peremptory strike of [one] black prospective juror . . . was not motivated

 in substantial part by discriminatory intent.” Flowers, 139 S. Ct. at 2251. Finally,
 STATE V. CLEGG

 2022-NCSC-11

 Opinion of the Court

 while a trial court’s Batson determination is granted significant deference upon

 review, “deference does not by definition preclude relief.” Miller-El, 545 U.S. at 240.1

¶ 49 This Court has likewise provided clarification of its framework for analyzing

 claims of racial discrimination in jury selection. Principally, this Court has adopted

 the Batson test for review of peremptory challenges under the North Carolina

 Constitution. See State v. Fair, 354 N.C. 131, 140 (2001) (“Our courts have adopted

 the Batson test for review of peremptory challenges under the North Carolina

 Constitution.”); State v. Taylor, 362 N.C. 514, 527 (discussing the Batson test and

 noting that “this Court subsequently adopted that same test”); State v. Waring, 364

 N.C. 443, 474 (2010) (“Our review of race-based . . . discrimination during petit jury

 selection has been the same under both the Fourteenth Amendment to the United

 States Constitution and Article 1, Section 26 of the North Carolina Constitution”).

 Regarding the first step, “a prima facie showing of racial discrimination is not

 intended to be a high hurdle for defendants to cross. Rather, the showing need only

 be sufficient to shift the burden to the State to articulate race-neutral reasons for its

 peremptory challenge.” Hobbs, 374 at 350 (cleaned up). Regarding the second step,

 1 Notably, while the trial court’s firsthand ability to assess a prosecutor’s demeanor

 and credibility render this significant appellate deference appropriate, there are also human
 factors that render an appellate court’s removed consideration of a Batson challenge useful;
 namely, while a trial judge may feel understandably or unconsciously hesitant to imply that
 a prosecutor engaged in racial discrimination while that prosecutor is standing right in front
 of her, appellate judges enjoy a review of the written record further removed from such
 immediate interpersonal dynamics.
 STATE V. CLEGG

 2022-NCSC-11

 Opinion of the Court

 “[t]he State’s explanation must be clear and reasonably specific, but does not have to

 rise to the level of justifying a challenge for cause. Moreover, unless a discriminatory

 intent is inherent in the prosecutor’s explanation, the reason offered will be deemed

 race neutral.” Id. at 352 (internal quotations omitted). Finally, in engaging in our

 own analysis, this Court seeks to be “sensitive to Batson’s requirements” and must

 align itself with applicable guidance from the U.S. Supreme Court. Waring, 364 N.C.

 at 475.

 B. Case at Bar

¶ 50 With this history and precedent as our guide, we now consider defendant’s

 present Batson challenge. “On appeal, a trial court’s ruling on the issue of

 discriminatory intent must be sustained unless it is clearly erroneous.” Snyder, 552

 U.S. at 477; see also Waring, 364 N.C. at 475 (“The trial court’s ruling will be

 sustained unless it is clearly erroneous.”). As noted above, such “clear error” is

 “deemed to exist when, on the entire evidence[,] the Court is left with the definite and

 firm conviction that a mistake has been committed.” Bennett, 374 N.C. at 592 (cleaned

 up). We are left with such a conviction here, and therefore hold that the trial court’s

 order overruling defendant’s Batson challenge was clearly erroneous.

 1. Batson Step One: Prima Facie Showing

¶ 51 In the first step of a Batson challenge, “a defendant must make a prima facie

 showing that a peremptory challenge has been exercised on the basis of race[.]”
 STATE V. CLEGG

 2022-NCSC-11

 Opinion of the Court

 Snyder, 552 U.S. at 476; see Taylor, 362 N.C. at 527 (“First, the defendant must make

 a prima facie showing that the state exercised a race-based peremptory challenge”).

 “[A] defendant satisfies the requirements of Batson’s first step by producing evidence

 sufficient to permit the trial judge to draw an inference that discrimination has

 occurred.” Johnson, 545 U.S. at 170; see State v. Hobbs, 374 N.C. 345, 350 (2020)

 (quoting Johnson for this proposition). “A prima facie showing of racial discrimination

 is not intended to be a high hurdle for defendants to cross. Rather, the showing need

 only be sufficient to shift the burden to the State.” Hobbs, 374 N.C. at 350 (cleaned

 up).

¶ 52 In response to this initial challenge, the prosecutor may argue that the

 defendant has failed to establish prima facie showing of discrimination. “However,

 once a prosecutor has offered a race-neutral explanation for the peremptory challenge

 and the trial court has ruled on the ultimate question of intentional discrimination,

 the preliminary issue of whether the defendant had made a prima facie showing

 becomes moot.” Bell, 359 N.C. at 12 (cleaned up); see also Hobbs, 374 N.C. at 354

 (“Where the State has provided reasons for its peremptory challenges, thus moving

 to Batson’s second step, and the trial court has ruled on them, completing Batson’s

 third step, the question of whether a defendant initially established a prima facie

 case of discrimination becomes moot.”).

¶ 53 Here, immediately after the prosecutor completed his questioning of potential
 STATE V. CLEGG

 2022-NCSC-11

 Opinion of the Court

 jurors, defense counsel raised a Batson challenge regarding the prosecutor’s

 peremptory strikes of Ms. Jeffreys and Ms. Aubrey. In support of her challenge,

 defense counsel noted both the State’s disproportionate use of peremptory strikes

 against Black prospective jurors and the lack of other distinguishing factors between

 the excluded Black potential jurors and accepted white potential jurors. Specifically,

 defense counsel stated:

 [S]o far, there have been four challenges by the State and
 if my numbers are correct, there were two white males and
 two black females. Ms. Viola Jeffreys who was originally
 placed in Seat No. 5 and then subsequently Ms. Gwendolyn
 Aubrey who was placed in Seat No. 5, both women are
 African-American. They are the only African-Americans
 seated in the jury box at this point in time.2 Both have been
 cut by the State. I’m at a loss as to what it was that caused
 the State to determine that they should be cut in light of
 the comparables in the jury pool. The only distinction I see
 is color. Therefore, we would object to and challenge the
 State’s peremptory challenges made thus far.

¶ 54 The trial court then gave the prosecutor an opportunity to address the Batson

 challenge. Rather than asserting that defendant had not established prima facie

 showing of discrimination, the prosecutor instead began providing justifications for

 the challenged peremptory strikes. As the trial court identified in its subsequent

 response, this moved directly to the second step of the Batson analysis:

 All right. This is a three-step process and the first step is
 for the defense to make a prima facie argument. Mr. Wiggs,

 2 Later, when asked to self-identify his race, Juror #12 stated “My dad is black and

 my mom is Chinese . . . [s]o I’m whatever you call that.”
 STATE V. CLEGG

 2022-NCSC-11

 Opinion of the Court

 you moved directly to the second step, which is fine, which
 is that you offered neutral—with what you purport to be
 neutral justification.

 Accordingly, step one of defendant’s Batson challenge was rendered moot, and “we

 need not examine whether defendant met his initial burden.” Hobbs, 374 N.C. at 355

 (cleaned up). The trial court, therefore, did not err in concluding the same.3

 2. Batson Step Two: Race-Neutral Reasoning

¶ 55 Second, “[o]nce the defendant makes prima facie showing, the burden shifts to

 the State to come forward with a neutral explanation for challenging black jurors.”

 Batson, 476 U.S. at 97; see Fair, 354 N.C. at 140 (“If this showing is made, the court

 advances to the second step, where the burden shifts to the state to offer a facially

 valid, race-neutral rationale for its peremptory challenge”). As noted above, this step

 “does not demand an explanation that is persuasive, or even plausible[,]” but only one

 that is facially race-neutral. Purkett, 514 U.S. at 768; see Fair, 354 N.C. at 140

 (stating this same proposition). “As long as the state’s reason appears facially valid

 and betrays no inherent discriminatory intent, the reason is deemed race-neutral.”

 Fair, 354 N.C. at 140.

¶ 56 Here, during the initial Batson inquiry before trial, the prosecutor contended

 3 The Court of Appeals also correctly, if implicitly, held step one of the Batson inquiry

 to be moot when it noted that “the trial court heard the State’s reasons for striking Jeffreys
 and Aubrey prior to making a ruling on defendant’s Batson objections,” and subsequently
 moved to step two. Clegg, 2017 WL 3863494 at *3.
 STATE V. CLEGG

 2022-NCSC-11

 Opinion of the Court

 that he struck both Ms. Jeffreys and Ms. Aubrey for their body language and lack of

 eye contact. He further asserted that he struck Ms. Jeffreys because of her potential

 bias toward defendant arising from her previous employment at Dorothea Dix

 Hospital, and that he struck Ms. Aubrey because she answered “I suppose” to a

 question asking whether she could be fair and impartial. The trial court subsequently

 found that these reasons “constitute neutral justifications for exercising peremptory

 challenges” in satisfaction of Batson step two.

¶ 57 Later, at the Batson rehearing, the prosecutor offered slightly different reasons

 for his peremptory strikes of Ms. Jeffreys and Ms. Aubrey. Regarding Ms. Jeffreys,

 the prosecutor again asserted that the peremptory strike “was based primarily on her

 stated occupation as being retired from Dorothea Dix Hospital, with the

 understanding that she was a nurse to mental health patients who were suffering

 from mental health diseases.” Because defendant’s “mental health was an underlying

 issue and concern for the defense,” the prosecutor contended, “it was the State’s belief

 [that Ms. Jeffreys] would possibly be sympathetic to the defendant despite

 overwhelming evidence of his guilt.” The prosecutor did not mention Ms. Jeffreys’s

 body language or lack of eye contact at the rehearing.

¶ 58 Regarding his strike of Ms. Aubrey, the prosecutor proffered two rationales at

 the rehearing. The first was the same as before trial: “her body language and her lack

 of eye contact.” Second, the prosecutor noted that Ms. Aubrey had replied “I suppose”
 STATE V. CLEGG

 2022-NCSC-11

 Opinion of the Court

 to a question regarding whether she felt confident that she could focus on the trial.

 The prosecutor further noted that when he asked Ms. Aubrey a follow-up question on

 this issue, she replied “I think so.” These short and equivocal answers, combined with

 “her body language and her lack of eye contact,” the prosecutor asserted, created

 concern about “whether or not [Ms. Aubrey] could be an engaged juror throughout

 [the trial].”

¶ 59 The prosecutor then addressed the shift in this reasoning between the initial

 Batson inquiry and the rehearing. Noting that he was “completely flustered when

 this was brought up during trial[,]” the prosecutor conceded that he “missp[oke] with

 respect to the…question that Ms. Aubrey was answering.” He then confirmed that

 Ms. Aubrey had in fact answered “I suppose” not to a question about being fair and

 impartial, but about being confident in her ability to focus on the trial, and that he

 had “confus[ed] those questions and her answer.”

¶ 60 In assessing the prosecutor’s proffered reasons at the rehearing, the trial court

 again accepted the justifications as race-neutral in satisfaction of the State’s burden

 of production under Batson step two. Regarding the proffered reason for the strike of

 Ms. Jeffreys, the trial court stated during the rehearing that her previous

 employment at Dorothea Dix was a “distinguishing race[-]neutral fact” and “an

 appropriate ground for a peremptory challenge.” The court further stated in its

 written rehearing order that “[a]s to juror Viola Jeffreys, the State offered a race-
 STATE V. CLEGG

 2022-NCSC-11

 Opinion of the Court

 neutral reason for exercising the strike.”

¶ 61 The trial court likewise found the prosecutor’s rehearing reasoning for striking

 Ms. Aubrey to be race-neutral. Specifically, the court’s rehearing order stated that

 “had the prosecutor, in offering his race-neutral basis for exercising the strike of Ms.

 Aubrey, stated that he was concerned that she had answered ‘I suppose[]’ to the

 question of whether she could focus, . . . that, in the [c]ourt’s view, would have

 constituted a neutral justification for the strike.” The court later likewise described

 the “body language” and “lack of eye contact” justification as another “race-neutral

 reason articulated by the prosecutor.”

¶ 62 We cannot find that the trial court erred in determining that the prosecutor

 met his burden of production under Batson step two. To be clear, as clarified by the

 U.S. Supreme Court in Purkett, the inquiry here is limited only to whether the

 prosecutor offered reasons that are race-neutral, not whether those reasons

 withstand any further scrutiny; that scrutiny is reserved for step three. See 514 U.S.

 at 767–68; Johnson, 545 U.S. at 171 (“Thus, even if the State produces only a frivolous

 or utterly nonsensical justification for its strike, the case does not end—it merely

 proceeds to step three.”). The prosecutor’s proffered reasons here—body language and

 lack of eye contact, concern of bias, concern of partiality, and concern of lack of focus—

 are all facially race-neutral. Accordingly, the trial court’s findings here and

 subsequent decision to move to step three of the Batson analysis was not erroneous.
 STATE V. CLEGG

 2022-NCSC-11

 Opinion of the Court

 3. Batson Step Three: Determining Discrimination

¶ 63 Under Batson’s third and final step, “[t]he trial court…[has] the duty to

 determine if the defendant has established purposeful discrimination.” 476 U.S. at

 98; see Waring, 364 N.C. at 475 (“Finally, the trial court must then determine whether

 the defendant has met the burden of proving purposeful discrimination”) (cleaned

 up). At this stage, the trial judge must consider all of the relevant circumstances and

 reasoning submitted by both parties to “determine whether the prosecutor’s stated

 reasons were the actual reasons or instead were a pretext for discrimination.”

 Flowers, 139 S. Ct. at 2241. In conceptualizing this framework as a whole, a common

 judicial analogy proves illustrative: in step one (and in subsequent rebuttal),4 the

 defendant places his reasoning on the scale; in step two (and in subsequent rebuttal),5

 the State places its counter-reasoning on the scale; in step three, the court carefully

 weighs all of the reasoning from both sides to ultimately “decid[e] whether it was

 more likely than not that the challenge was improperly motivated.” Johnson, 545 U.S.

 at 170; see Hobbs, 374 N.C. at 351 (quoting Johnson for this proposition). If so, the

 defendant has established a Batson violation.

¶ 64 Here, the trial court’s rehearing order carefully described its step three

 4 After the prosecutor proffers race-neutral reasoning in step two, “[o]ur courts allow

 the defendant to submit evidence to show that the state’s proffered reason is merely a pretext
 for discrimination.” Fair, 354 N.C. at 140. Trial courts may subsequently allow the prosecutor
 an opportunity for surrebuttal before making their ultimate ruling under step three.
 5 See note 4 above.
 STATE V. CLEGG

 2022-NCSC-11

 Opinion of the Court

 analysis weighing the reasoning submitted by defendant and the prosecutor. First,

 the court ruled that the prosecutor’s peremptory strike of Ms. Jeffreys (on the basis

 of concern of potential bias) did not constitute a Batson violation. Specifically, the

 court stated:

 The record reflects that, in prior proceedings in this case,
 the [d]efendant’s competency had been called into question
 and evaluations ordered. The State’s stated basis for
 striking Ms. Jeffreys due to her work history in the mental
 health field is rationally related to the defendant’s
 potential competency issues, and thus the [c]ourt finds this
 reason is supported by the record and constitutes an
 appropriate justification for the strike.

 Because we later conclude that the trial court clearly erred in overruling defendant’s

 Batson challenge regarding Ms. Aubrey, and “[t]he Constitution forbids striking even

 a single prospective juror for a discriminatory purpose[,]” we decline to consider

 whether the trial court’s ruling regarding Ms. Jeffreys was also clearly erroneous.

 Snyder, 552 U.S. at 478.

¶ 65 Second, the trial court weighed the reasoning provided by both defendant and

 the prosecutor regarding the peremptory strike of Ms. Aubrey. After reviewing the

 transcript from the initial Batson inquiry, the trial court stated that “[i]t is evident

 from the record that both the trial court’s and the prosecutor’s memory of the answers

 given by Ms. Aubrey was conflated. She did not say ‘I suppose’ in response to a

 question of whether she could be ‘fair and impartial.’ ” Rather, the court went on to

 observe from the record, she provided that answer in response to the prosecutor’s
 STATE V. CLEGG

 2022-NCSC-11

 Opinion of the Court

 question about whether she felt confident that she could focus on the trial. The trial

 court then stated the following:

 8. In retrospect, had the prosecutor, in offering his race-
 neutral basis for exercising the strike of Ms. Aubrey, stated
 that he was concerned that she had answered “I suppose”
 to the question of whether she could focus, when coupled
 with her concern that she worked ‘day and night’ and would
 miss work, that, in the [c]ourt’s view, would have
 constituted a neutral justification for the strike.

 9. However, as it stands, the State’s offered reason for
 striking Ms. Aubrey based on her “I suppose” answer is not
 supported by the record because the prosecutor associated
 that answer with whether she could be “fair and impartial,”
 not whether she could focus.

¶ 66 The trial court then observed that under the U.S. Supreme Court’s ruling in

 Foster, “when reasons that are offered by a prosecutor as a basis for exercising a strike

 contradict or mischaracterize the record, those reasons must be rejected in evaluating

 whether race was a motivating factor in exercising the strike,” citing Foster, 578 U.S.

 at 505, 510. “Moreover,” the court continued, “a trial court is not permitted to consider

 race-neutral reasons for exercising a strike that are not articulated by the

 prosecutor,” citing Miller-El, 545 U.S. at 250–52. Accordingly, the trial court ruled

 that “[s]trict application of the rules articulated in Foster and Miller-El to the race-

 neutral (but mis-remembered) reasons provided by the prosecutor justifying Ms.

 Aubrey’s strike . . . require the [c]ourt to exclude and not consider the reason

 articulated by the prosecutor – that Ms. Aubrey said that ‘she supposed’ she could be
 STATE V. CLEGG

 2022-NCSC-11

 Opinion of the Court

 fair and impartial – because that reason is contradicted by the record.”

¶ 67 Having thus rejected the prosecutor’s “I suppose” rationale, the trial court then

 moved on to consider what it noted was “the only [remaining] race-neutral reason

 articulated by the prosecutor[:] . . . the ‘body language’ and ‘lack of eye contact’

 rationale.” However, the trial court found that this reasoning, too, was invalid.

 Specifically, the court noted that “[t]he ‘body language’ rationale was disputed by trial

 counsel for the [d]efendant, and the trial court made no specific findings regarding

 Ms. Aubrey’s body language or demeanor.” Under the U.S. Supreme Court’s ruling in

 Snyder, the trial court stated, “the ‘body-language’ race-neutral justification offered

 by the prosecutor cannot be viewed as sufficient” in the absence of any corroborating

 findings of fact by the trial court. “As such,” the trial court ruled, “both race-neutral

 justifications offered by the prosecutor fail – one because the prosecutor mis-

 remembered the question to which Ms. Aubrey responded ‘I suppose,’ and the other

 because the trial court failed to make sufficient findings of fact to establish a record

 of Ms. Aubrey’s body language.” In other words, the prosecution had placed two

 reasons on the scale, and the trial court deemed them both weightless.

¶ 68 The trial court then considered the evidence proffered by defendant tending to

 show racial discrimination. Specifically, the court weighed defendant’s statistical

 evidence “both relating to the trial at issue and [to] North Carolina at large.” With

 respect to this trial, that evidence identified that of the twenty-two members of the
 STATE V. CLEGG

 2022-NCSC-11

 Opinion of the Court

 jury pool, three were people of color. Further, of the prosecutor’s four peremptory

 strikes, two were used strike two of those three potential jurors of color, “which also

 turned out to be all the” women of color. Proportionally, then, the State struck about

 ten percent of the eligible white jurors and about sixty-six percent of the eligible

 jurors of color, resulting in a jury of eleven white members and one member of mixed

 race. When asked by defense counsel to identify their race, none of the selected jurors

 self-identified as African American.6

¶ 69 The trial court then noted defendant’s evidence of racial disparities in the

 exercise of peremptory strikes across North Carolina. Specifically, the court noted

 that this evidence indicated “that in noncapital cases studied from 2011–12,

 prosecutors struck black venire members at about twice the rate of white.” (citing

 Pollitt & Warren, 94 N.C. L. Rev. at 1964).

¶ 70 Finally, the trial court weighed defendant’s “side-by-side comparison of

 questioning of white jurors and African[-]American jurors.” Specifically, the court

 considered defendant’s comparison of the prosecutor’s questioning of Ms. Aubrey with

 that of fellow prospective juror Mr. David Williams regarding their ability to focus

 during trial. The court noted the following exchange from the record:

 Prosecutor: I don’t need specifics, but, you know, is there a
 possibility that your mind could drift somewhere else when
 we need you to be focusing on the proceedings here?

 6 See note 2.
 STATE V. CLEGG

 2022-NCSC-11

 Opinion of the Court

 Mr. Williams: I have 11 employees out in the field, so –

 Prosecutor: Okay. Ms. Aubrey, do you feel confident you
 can focus on what’s going on here?

 Ms. Aubrey: I suppose.

 Prosecutor: I want you to be confident about it. You just
 don’t want to be a juror or do you feel like if you were here,
 you could focus and do what we need you to do?

 Ms. Aubrey: I think so.

¶ 71 Upon review, though, the trial court did not find this comparison “particularly

 pertinent because Mr. Williams had previously stated that, with respect to his

 supervisory duties, ‘I can juggle things around[,]’ whereas Ms. Aubrey did not indicate

 any flexibility in her ‘day and night’ work schedule that might ease her concern about

 missing work.”

¶ 72 The trial court then moved to its final determination regarding defendant’s

 Batson challenge. “Here,” the court ruled, “[d]efendant has shown that the race-

 neutral justifications offered by the prosecutor cannot be supported by the record –

 either because the prosecutor mis-remembered the potential juror’s answer or

 because the trial court failed to make an adequate record of the body language of the

 prospective juror.” “The [d]efendant has also shown,” the court continued, “evidence

 of statistical disparities in the exercise of peremptory challenges by prosecutors in

 statewide jury selection studies in data collected from 1990 to 2012.” Reaching its

 ultimate conclusion, though, the court stated:
 STATE V. CLEGG

 2022-NCSC-11

 Opinion of the Court

 However, the [c]ourt cannot conclude from this record that
 in this case, the State has engaged in “purposeful
 discrimination.” As the [d]efendant points out, the
 applicable standard is, given all relevant circumstances,
 “whether it was more likely than not that the challenge
 was improperly motivated.” Johnson v. California, 545
 U.S. 162, 170 (2005). Even on this relaxed “more likely
 than not” standard, this [c]ourt concludes that essential
 evidence of purposeful discrimination—which is the
 defendant’s burden to prove—is lacking.

¶ 73 To support this conclusion, the trial court reasoned that “[t]he cases in which

 the [U.S.] Supreme Court has found that the state exercised peremptory challenges

 in a purposefully discriminatory fashion are strikingly different from the case at

 hand.” As examples, the court discussed Foster and Miller-El, in which the

 prosecutors had exhibited “smoking-gun” evidence of racial discrimination such as,

 respectively, highlighting the names of all Black potential jurors on their juror list

 and asking Black potential jurors a “trick question” not asked of white potential

 jurors. See Foster, 578 U.S. at 493–95; Miller-El, 545 U.S. at 255. The trial court

 reasoned that because this case was “markedly distinguishable” from those cases and

 involved “an instance of a prosecutor mis-remembering” rather than a

 “‘mischaracterization’ of the record[,]” “the quantum of evidence in this case . . . is

 insufficient to support the conclusion that the prosecutor engaged in purposeful

 discrimination.”

¶ 74 Our review of the trial court’s Batson step three analysis reveals several errors

 that collectively leave this Court “with the definite and firm conviction that a mistake
 STATE V. CLEGG

 2022-NCSC-11

 Opinion of the Court

 has been committed[,]” thus rendering the trial court’s determination clearly

 erroneous. Bennett, 374 N.C. at 592. As noted above, “[w]e need not and do not decide

 that any one of those [errors] alone would require reversal. All that we need to decide,

 and all that we do decide, is that all of the relevant facts and circumstances taken

 together establish that the trial court committed clear error in concluding that the

 State’s peremptory strike of [a] black prospective juror . . . was not ‘motivated in

 substantial part by discriminatory intent.’ ” Flowers, 139 S. Ct. at 2235 (quoting

 Foster, 578 U.S. at 512). Before discussing the trial court’s errors, though, it is first

 worth noting several points of analysis on which the trial court was correct.

¶ 75 First, the trial court acted properly in rejecting the prosecutor’s proffered “I

 suppose” reasoning. As the U.S. Supreme Court illustrated in Foster, proffered

 reasons that are contradicted by the record are unacceptable in supporting a

 challenged peremptory strike. See 578 U.S. at 505. (“Moreover, several of Lanier’s

 reasons…are similarly contradicted by the record”). Likewise, shifting explanations

 indicate pretext and should be viewed with suspicion. See id. at 507 (“As an initial

 matter, the prosecutor’s principal reasons for the strike shifted over time, suggesting

 that those reasons may be pretextual.”).

¶ 76 Here, the prosecutor’s “fair and impartial” reasoning during the initial Batson

 inquiry was contradicted by the record, and his “focus” reasoning during the

 rehearing amounted to a shifting explanation. Whether the initial misstatement was
 STATE V. CLEGG

 2022-NCSC-11

 Opinion of the Court

 the product of accidental “misremembering,” as the trial court found, or intentional

 “mischaracterizing” does not change the fact that the proffered reason was plainly

 unsupported by the record. Accordingly, the trial court properly rejected this

 rationale.7 To the extent that the trial court viewed this misstatement “in the light

 most favorable to the prosecutor,” as it offhandedly remarked during the rehearing,

 though, that would reflect a fundamental misunderstanding of the Batson framework

 and constitute error. However, because the trial court articulated the correct burden

 of proof in its written order, we do not consider this remark further.

¶ 77 Second and similarly, the trial court properly rejected the prosecutor’s “body

 language and lack of eye contact” reasoning. As the U.S. Supreme Court indicated in

 Snyder, while demeanor-based reasoning can be rightly credited “where a trial judge

 has made a finding that an attorney credibly relied on demeanor in exercising a

 strike[,]” without such corroboration “we cannot presume that the trial judge credited

 the prosecutor’s assertion” regarding the potential juror’s demeanor. 552 U.S. at 479.

 Here, not only did the trial judge not corroborate the prosecutor’s assertion regarding

 Ms. Aubrey’s body language and eye contact, defense counsel specifically refuted it.

 7 While the dissent claims that “the trial court may have taken the holding in Miller-

 El too literally” in rejecting the State’s proffered reasoning here (¶ 26), we understand the
 trial court to have simply concluded that the U.S. Supreme Court meant what it said when
 it held that “[i]f the stated reason does not hold up, its pretextual significance does not fade
 because a trial judge, or an appeals court, can imagine a reason that might not have been
 shown up as false.” Miller-El, 545 U.S. at 252. Notably, the Court of Appeals made this same
 misstep when it provided its own “clarification” to the State’s actual proffered reason. See
 Clegg, WL 3863494 at *4.
 STATE V. CLEGG

 2022-NCSC-11

 Opinion of the Court

 Because the trial court made no specific findings of fact regarding Ms. Aubrey’s body

 language, it properly rejected this reasoning at the rehearing.

¶ 78 What’s more, the prosecutor’s demeanor-based reasoning here was even less

 specific—and therefore less credible—than that rejected in Snyder. In Snyder, the

 prosecutor claimed that the rejected juror was “nervous,” a description that at least

 minimally invokes a commonly understood set of more specific behaviors. Id. Here,

 the prosecutor merely stated that he struck Ms. Aubrey due to her “body language”

 without ever specifying anything in particular that might have been concerning about

 her body language. Further, during the initial pre-trial Batson inquiry, the prosecutor

 never distinguished between Ms. Jeffreys and Ms. Aubrey when discussing body

 language—he only referred to the two Black women collectively, twice referring to

 “their body language” without any further specification. This complete lack of

 specificity significantly undermines the credibility of the prosecutor’s reasoning.

¶ 79 Historical context provides even more reason for courts engaging in a Batson

 analysis to view generalized “body language and lack of eye contact” justifications

 with significant suspicion. For example, as recently as 1995, prosecutorial training

 sessions conducted by the North Carolina Conference of District Attorneys included

 a “cheat sheet” titled “Batson Justifications: Articulating Juror Negatives." See Pollitt

 & Warren, 94 N.C. L. REV. at 1980 (noting a North Carolina trial court’s summary of

 this document in a 2012 Order on a defendant’s motion for appropriate relief). This
 STATE V. CLEGG

 2022-NCSC-11

 Opinion of the Court

 document provided prosecutors with a list of facially race-neutral reasons that they

 might proffer in response to Batson objections. See id.; see also Jacob Biba, Race

 Neutral, THE INTERCEPT, Nov. 8, 2021, https://theintercept.com/2021/11/08/north-

 carolina-jury-racial-discrimination/ (describing the prosecutorial training and Batson

 Justification worksheet); Tonya Maxwell, Black juror’s dismissal, death penalty,

 revisited in double homicide, THE ASHEVILLE CITIZEN-TIMES, Nov. 3, 2016,

 https://www.citizen-times.com/story/news/local/2016/11/03/black-jurors-dismissal-

 death-penalty-revisited-double-homicide/93168824/ (same). The list included both

 “body language” and “lack of eye contact,” in addition to “attitude,” “air of defiance,”

 and “monosyllabic” responses to questions.8

¶ 80 Of course, North Carolina is not unique here. When placed within our well-

 established national history of prosecutors employing peremptory challenges as tools

 of covert racial discrimination, this historical context cautions courts against

 accepting overly broad demeanor-based justifications without further inquiry or

 corroboration. See Flowers, 139 S. Ct. at 2239–40 (“And when [other discriminatory]

 tactics failed, or were invalidated, prosecutors could still exercise peremptory strikes

 in individual cases to remove most or all black prospective jurors.”). Accordingly, the

 trial court properly rejected the prosecutor’s unconfirmed and generalized “body

 8 Here, in justifying his peremptory strike of Ms. Aubrey, the prosecutor repeatedly

 noted that her answers were “short.”
 STATE V. CLEGG

 2022-NCSC-11

 Opinion of the Court

 language and lack of eye contact” rationale below.

¶ 81 Third and finally, the trial court acted properly in considering defendant’s

 statistical evidence regarding the disproportionate use of peremptory strikes against

 Black potential jurors in both this case and statewide. As recently identified by the

 U.S. Supreme Court in Flowers, such data is included among the many types of

 evidence that a defendant may present, and a court may consider, within a Batson

 challenge. 139 S. Ct. at 2243 (listing examples of the variety of evidence defendants

 may present in Batson challenges).

¶ 82 Despite the areas in which the trial court acted properly, though, several other

 areas of its Batson step three analysis were erroneous. Like the U.S. Supreme Court

 in Flowers, we do not identify any one of the trial court’s mistakes as independently

 requiring reversal. Rather, we determine that “all of the relevant facts and

 circumstances taken together establish that the trial court committed clear error in

 concluding that the State’s peremptory strike of [Ms. Aubrey] was not motivated in

 substantial part by discriminatory intent.” Flowers, 139 S. Ct. at 2251. Specifically,

 we note four interrelated errors: (1) overruling defendant’s Batson challenge after

 rejecting all of the race-neutral reasons provided by the prosecutor; (2) applying an

 improperly high burden of proof; (3) independently considering reasoning not offered

 by the prosecutor; and (4) giving inadequate consideration to racially disparate

 questioning and acceptance of comparable jurors.
 STATE V. CLEGG

 2022-NCSC-11

 Opinion of the Court

¶ 83 First, the trial court erred by ruling that defendant had not met his Batson

 burden after determining that “both race-neutral justifications offered by the

 prosecutor fail.” Under the Batson framework, after the defendant and the State have

 offered their reasoning, the trial court must determine, in light of these submissions,

 “whether it was more likely than not that the [peremptory] challenge was improperly

 motivated.” Johnson, 545 U.S. at 170. If the trial court finds that all of the

 prosecutor’s proffered race-neutral justifications are invalid, it is functionally

 identical to the prosecutor offering no race-neutral justifications at all. In such

 circumstances, the only remaining submissions to be weighed—those made by the

 defendant—tend to indicate that the prosecutor’s peremptory strike was “motivated

 in substantial part by discriminatory intent.” Flowers, 139 S. Ct. at 2251. As a

 consequence, then, a Batson violation has been established.

¶ 84 Here, after careful analysis, the trial court explicitly ruled that “both race-

 neutral justifications by the prosecutor fail.” At that point, the only valid reasoning

 remaining for the court to consider was evidence presented by defendant tending to

 show that the peremptory challenge of Ms. Aubrey was motivated in substantial part

 by discriminatory intent: disparate data, disparate questioning, and disparate

 acceptance of substantially comparable jurors. Accordingly, after finding that both

 race-neutral justifications for the prosecutor’s peremptory strike of Ms. Aubrey failed,

 the trial court should have ruled on this record that defendant met his burden under
 STATE V. CLEGG

 2022-NCSC-11

 Opinion of the Court

 Batson. Ruling otherwise was erroneous.

¶ 85 Second, the trial court erred by holding defendant to an improperly high

 burden of proof. Under Batson, defendants must “establish purposeful

 discrimination.” 476 U.S. at 98. The U.S. Supreme Court has described this

 requirement as showing that a peremptory strike was “motivated in substantial part

 by discriminatory intent[,]” Flowers, 139 S. Ct. at 2251, or “whether it was more likely

 than not that the challenge was improperly motivated.” Johnson, 545 U.S. at 170.

¶ 86 Here, while the trial court properly recited this burden, it failed to apply it with

 fidelity. Instead, it looked for smoking-gun evidence of racial discrimination similar

 to what has been present in previous U.S. Supreme Court cases that have found

 Batson violations, namely Foster, 578 U.S. 488, and Miller-El, 545 U.S. 231. After

 noting the glaring evidence of discrimination present in those cases, the trial court

 found that “[t]his case is markedly distinguishable from the facts of this controlling

 authority.”

¶ 87 While that may be true, it is not the facts of those decisions that make them

 controlling authority—it’s the law. Highlighted names and trick questions are not

 required for a defendant to show that a peremptory was “motivated in substantial

 part by discriminatory intent.”9 Flowers, 139 S. Ct. at 2251. Rather, as defendant did

 9 Notably, the jury selections at question in both Foster and Miller-El took place in the

 late 1980s, either before or immediately after Batson was first decided. See 578 U.S. at 492
 (summarizing the initial crime and trial process); 545 U.S. at 235–236 (same). Given the
 STATE V. CLEGG

 2022-NCSC-11

 Opinion of the Court

 here, a defendant may present a wide variety of direct and circumstantial evidence

 in supporting a Batson challenge. See id. at 2243 (listing examples of acceptable

 evidence); Hobbs, 374 N.C. at 356 (same). By implicitly holding defendant to an

 improperly high burden, the trial court erred in its Batson step three analysis.

¶ 88 Third, the trial court erred by considering within its Batson step three analysis

 reasoning not presented by the prosecution on its own accord. In Miller-El, the U.S.

 Supreme Court held that “[a] Batson challenge does not call for a mere exercise in

 thinking up any rational basis. If the stated reason does not hold up, its pretextual

 significance does not fade because a trial judge, or an appeals court, can imagine a

 reason that might not have been shown up as false.” 545 U.S. at 252. Indeed, the trial

 court here noted as much both during the rehearing and in its subsequent order.

 During the rehearing, for instance, the trial court stated:

 [T]he [c]ourt cannot interpose [a] valid basis for the
 exercise of [a] peremptory challenge when the State fails to
 raise it . . . I would find that had the State said [“Ms.
 Aubrey] works day and night . . . and she’s sitting there
 slouching in her chair,[”] . . . it would be one thing. But I
 don’t think I can interpose that objection for the prosecutor
 in this case and say look, [had they] said that, . . . that
 would have been the basis of my ruling. So I think I’m stuck
 with what they said.

¶ 89 In its subsequent order, though, the trial court did not “st[i]ck with what they

 historical context noted above, it is unsurprising that Batson cases arising from trials in the
 late twentieth century may reveal more blatant evidence of racial discrimination in jury
 selection than those arising from trials today.
 STATE V. CLEGG

 2022-NCSC-11

 Opinion of the Court

 said.” For instance, when considering the prosecutor’s questioning of Ms. Aubrey and

 Mr. Williams, the court ruled that the comparison was “not . . . particularly pertinent

 because Mr. Williams had previously stated that, with respect to his supervisory

 duties, ‘I can juggle things around[,]’ . . . whereas Ms. Aubrey did not indicate any

 flexibility in her ‘day and night’ work schedule that might ease her concern about

 missing work.” But the prosecution had never advanced this “day and night”

 argument on its own accord—not at the initial Batson inquiry, and not the

 subsequent rehearing. While the prosecution certainly could have argued that Ms.

 Aubrey’s “day and night” work schedule might impact her ability to focus during trial,

 it did not. Accordingly, the trial court erred by considering this reasoning within its

 step three analysis.

¶ 90 Fourth and finally, the trial court erred by failing to adequately consider the

 disparate questioning and disparate acceptance of comparable white and Black

 prospective jurors. See Flowers, 139 S. Ct. at 2246 (“We next consider the State’s

 dramatically disparate questioning of black and white prospective jurors in the jury

 selection process.”). As typical during jury selection, the prosecutor in this case

 collectively asked all of the then-seated jurors whether they felt confident that they

 could focus during the trial. Specifically, the prosecutor asked:

 [D]o you all feel like you can, if you serve as a juror, . . . pay
 attention to the testimony and the evidence while you’re in
 the courtroom [and] focus exclusively on what’s going on in
 the courtroom? I know we all have distractions in our lives,
 STATE V. CLEGG

 2022-NCSC-11

 Opinion of the Court

 but is there anything that’s such a major distraction that
 your mind may be somewhere else when you should be
 focusing on what’s going on? I’m not asking you to tell me
 exactly what it is, but anybody have any kind of issues like
 that going on?

 Notably, in response to an earlier question from the trial court about “anything going

 on in [their lives] that would make it difficult or impossible for [them] to serve,”

 several of the jurors had indicated that they had potential work- or family-related

 logistical challenges, such as having to find coverage at work (Juror #6) or having one

 or more young children at home (Jurors # 9 and # 12), among others. Nevertheless,

 when none of the then-seated jurors responded to the prosecutor’s question about

 focus, the prosecutor took them at their word and immediately moved on to another

 topic without further questioning.

¶ 91 Later, the prosecutor used peremptory strikes to remove three of the initial

 jurors (including Ms. Jeffreys), leading to the seating of three replacement jurors,

 including Ms. Aubrey and Mr. David Williams. Like the initial batch of jurors, the

 trial court asked the three replacements whether they had anything going on in their

 lives that would make it difficult or impossible for them to serve. Ms. Aubrey

 responded: “[o]ther than missing work, no[,]” before clarifying in response to a follow-

 up question by the court that she worked both “[d]ay and night.” Mr. Williams

 responded: “I’m an irrigation contractor and this is our season, and I’m one of the

 service techs. But I can juggle things around.” Later, the prosecutor asked the three
 STATE V. CLEGG

 2022-NCSC-11

 Opinion of the Court

 replacement jurors the same question he had previously posed to the initial batch:

 Is there anything going on in your personal life . . . that
 would maybe take you away mentally from being engaged
 in what’s going on here in the courtroom? Again, I don’t
 need to know specifics, but, you know, is there a possibility
 that your mind could drift somewhere else when we need
 you to be focusing on the proceedings here?

 In response, like all of the initial jurors previously, Ms. Aubrey remained silent. Then,

 Mr. Williams spoke up, and the following exchange took place:

 [Mr. Williams]: I have 11 employees out in the field, so —

 Mr. Wiggs: Okay. Ms. Aubrey, do you feel confident that
 you can focus on what’s going on here?

 [Ms. Aubrey]: I suppose.

 Mr. Wiggs: I want you to be confident about it. You just
 don’t want to be a juror or do you feel like if you were here,
 you could focus and do what we need you to do?

 [Ms. Aubrey]: I think so.

 Mr. Wiggs: Okay. Thank you.

 Later, without asking any further questions to either Ms. Aubrey or Mr. Williams,

 the prosecutor used a peremptory strike to remove Ms. Aubrey from the jury pool, but

 did not remove Mr. Williams.

¶ 92 On review, this exchange stands out for two reasons: first for what the

 prosecutor did do, and second for what he did not do. First, out of the fifteen potential

 jurors that the prosecutor had asked about their ability to focus up to this point
 STATE V. CLEGG

 2022-NCSC-11

 Opinion of the Court

 (twelve initial and three replacements), Ms. Aubrey was the only one the prosecutor

 singled out for further specific questioning. And while Ms. Aubrey was the only

 potential juror who noted that she worked both “day and night,” she was far from the

 only one who had substantially similar work- or family-related logistical challenges

 that might impact her ability to focus. Accordingly, Ms. Aubrey’s “day and night”

 comment alone cannot bear the weight of justifying this disparate questioning.

 Indeed, “[a] per se rule that a defendant cannot win a Batson claim unless there is an

 exactly identical white juror would leave Batson inoperable; potential jurors are not

 products of a set of cookie cutters.” Miller-El, 545 U.S. at 247, n.6. In any event, as

 noted above, if the prosecutor was concerned about Ms. Aubrey working day and

 night, he never stated as much.

¶ 93 Second, this exchange stands out because of what the prosecutor did not do:

 follow up with Mr. Williams. After the prosecutor asked the question about focus, Mr.

 Williams, unique among the fifteen jurors up to this point, volunteered information

 that could most reasonably be understood as indicating that he had a professional

 obligation that might impact his ability to focus during trial: “I have 11 employees

 out in the field, so —”.10 Indeed, Mr. Williams had previously noted that he was self-

 10 The State has suggested that it is possible that, instead of indicating why he might

 not be able to focus during trial, Mr. Williams’ comment may have been providing a reason
 why he could focus during trial: because he “ha[d] 11 employees out in the field” who might
 be able to cover for him in his absence. While this explanation is not completely without
 merit, given the full context of the record (including the fact that none of the other fourteen
 STATE V. CLEGG

 2022-NCSC-11

 Opinion of the Court

 employed and that “this is our season[.]” Instead of following up with Mr. Williams

 about this comment, though, the prosecutor instead, without explanation, turned

 immediately to Ms. Aubrey: “Okay. Ms. Aubrey, do you feel confident you can focus

 on what’s going on here?” Ms. Aubrey then replied “I suppose[,]” and later, “I think

 so[,]” responses that are perfectly normal in jury selection and perhaps even more

 honest and conversational than a flat “yes.” Indeed, if Ms. Aubrey had answered with

 a flat “yes,” given the historical context noted above, one can realistically imagine a

 prosecutor seeking to justify a peremptory strike on the grounds that such an answer

 was too short, cold, or confident.

¶ 94 While “disparate questioning or investigation alone does not constitute a

 Batson violation[,]” it “can . . . , along with other evidence, inform the trial court’s

 evaluation of whether discrimination occurred.” Flowers, 139 S. Ct. at 2248. When

 viewed in the context of the full record, this exchange illustrates disparate

 questioning and exclusion of Ms. Aubrey compared to substantially comparable white

 potential jurors who were unquestioned and accepted by the prosecutor. Accordingly,

 the trial court should have fully considered this evidence within the totality of

 jurors felt compelled go out of their way to provide the prosecutor with a reason to prove why
 they could focus in response to a question asking for potential reasons why they could not) it
 appears more likely that Mr. Williams was beginning to suggest that he might not be able to
 focus. In any event, even accepting both potential meanings as reasonable, the most notable
 aspect of this exchange is that the prosecutor never followed up with Mr. Williams to clarify
 what exactly his comment was suggesting.
 STATE V. CLEGG

 2022-NCSC-11

 Opinion of the Court

 defendant’s submissions. Its failure to do so was erroneous.

¶ 95 “To reiterate, we need not and do not decide [whether] any of these four [errors]

 alone would require reversal.” Id. at 2251. Rather, we determine that when these

 errors are considered cumulatively and within the context of the full record of this

 case, we are “left with the definite and firm conviction that a mistake has been

 committed.” Bennett, 374 N.C. at 592. Accordingly, we hold that the trial court’s

 ruling overruling defendant’s Batson challenge was clearly erroneous.

 III. Remedy

¶ 96 Having determined that a Batson violation indeed occurred, we must now

 consider a just remedy. Because the finding of a Batson violation during jury selection

 necessitates the reversal of a defendant’s subsequent conviction by that jury, see

 Batson, 476 U.S. at 100 (noting that the finding of a violation “require[s] that

 petitioner’s conviction be reversed”); Flowers, 139 S. Ct. at 2252 (Alito, J., concurring)

 (agreeing with the majority opinion “that petitioner’s capital conviction cannot

 stand”), it would ordinarily follow that a defendant would receive a new trial.

¶ 97 Here, however, defendant has already served his entire sentence of active

 imprisonment from his now-reversed conviction, and has been discharged from all

 post-release supervision. N.C.G.S. 15A-1335 provides that “[w]hen a conviction or

 sentence imposed in superior court has been set aside on direct review or collateral

 attack, the court may not impose a new sentence for the same offense, or for a
 STATE V. CLEGG

 2022-NCSC-11

 Opinion of the Court

 different offense based on the same conduct, which is more severe than the prior

 sentence less the portion of the prior sentence previously served.”

 IV. Conclusion

¶ 98 Today, as surely as in 1880 and 1986, racial discrimination in jury selection

 violates a defendant’s constitutional right to equal protection of the law. See Strauder,

 100 U.S. 303; Batson, 476 U.S. 79. Furthermore, it undermines the credibility of our

 judicial system as a whole, thus tearing at the very fabric of our democratic society.

 See Batson, 476 at 87 (“The harm from discriminatory jury selection extends beyond

 that inflicted on the defendant and the excluded juror to touch the entire

 community.”). Accordingly, the Batson framework establishes a process through

 which we seek to root out any remaining vestiges of racial discrimination in jury

 selection through the use of peremptory strikes.

¶ 99 In reality, the finding of a Batson violation does not amount to an absolutely

 certain determination that a peremptory strike was the product of racial

 discrimination. Rather, the Batson process represents our best, if imperfect, attempt

 at drawing a line in the sand establishing the level of risk of racial discrimination

 that we deem acceptable or unacceptable.11 If a prosecutor provides adequate

 11 See People v. Gutierrez, 2 Cal. 5th 1150, 1182–83 (2017) (Liu, J., concurring) (“In most

 cases, courts cannot discern a prosecutor’s subjective intent with anything approaching
 certainty. But the issue is not whether the evidence of improper discrimination approaches
 certainty or even amounts to clear and convincing proof. The ultimate issue is whether it was
 STATE V. CLEGG

 2022-NCSC-11

 Opinion of the Court

 legitimate race-neutral explanations for a peremptory strike, we deem that risk

 acceptably low. If not, we deem it unacceptably high.

¶ 100 Here, that risk was unacceptably high. After the prosecutor struck two Black

 women from the jury, defendant raised a Batson challenge presenting evidence

 tending to indicate that racial discrimination was a substantial motivating factor.

 The prosecutor then proffered two race-neutral justifications for each peremptory

 strike. Upon review of the peremptory strike of Ms. Gwendolyn Aubrey, the trial court

 found that “both race-neutral reasons offered by the prosecutor fail.” At that point,

 the only valid reasoning remaining for the trial court to consider was defendant’s

 evidence of discrimination. As a consequence, the totality of the evidence presented

 for the court to consider established that it was sufficiently likely that the strike was

 motivated in substantial part by discriminatory intent. This constitutes a substantive

 violation of defendant’s constitutional right to equal protection under the Fourteenth

 Amendment of the United States Constitution, and the trial court clearly erred in

 ruling to the contrary. Accordingly, the trial court’s order overruling defendant’s

 Batson objection is reversed, defendant’s conviction is vacated, and the case is

 remanded to the trial court for any further proceedings.

 more likely than not that the challenge was improperly motivated. This probabilistic
 standard is not designed to elicit a definitive finding of deceit or racism. Instead, it defines a
 level of risk that courts cannot tolerate in light of the serious harms that racial discrimination
 in jury selection causes to the defendant, to the excluded juror, and to public confidence in
 the fairness of our system of justice.”) (cleaned up).
 STATE V. CLEGG

 2022-NCSC-11

 Opinion of the Court

REVERSED AND REMANDED.
 Justice EARLS concurring.

¶ 101 I join fully in the majority’s opinion. I agree that the prosecutor’s use of a

 peremptory challenge to exclude Ms. Aubrey, an African-American prospective juror,

 from the jury empaneled to hear this case violated the Equal Protection Clause of the

 Fourteenth Amendment. Indeed, “[e]qual justice under law requires a criminal trial

 free of racial discrimination in the jury selection process.” Flowers v. Mississippi, 139

 S. Ct. 2228, 2242 (2019). I also agree that it is proper to reverse the trial court’s order

 overruling Mr. Clegg’s Batson objection and for his conviction to be vacated. Mr. Clegg

 has served his sentence and completed post-release supervision. By statute, where a

 conviction has been set aside “the court may not impose a new sentence for the same

 offense, or for a different offense based on the same conduct, which is more severe

 than the prior sentence less the portion of the prior sentence previously served.”

 N.C.G.S. § 15A-1335 (2021). The State’s interest in prosecuting and punishing Mr.

 Clegg for the crimes with which he was charged has already been fully satisfied.

¶ 102 I would further hold that the prosecutor’s use of a peremptory challenge to

 exclude Ms. Jeffreys, another African-American woman, also violated the Fourteenth

 Amendment under Batson. It is important to address this question because the

 constitutional interest involved here is not simply the Fourteenth Amendment right

 of the defendant to a trial free from racial discrimination. “The Batson decision was

 grounded in the criminal defendant’s right to equal protection of the
 STATE V. CLEGG

 2022-NCSC-11

 Earls, J., concurring

laws . . . . Batson also concluded, however, that race-based exclusion of jurors violates

the equal protection rights of the excluded jurors . . . .” Barbara D. Underwood,

Ending Race Discrimination in Jury Selection: Whose Right Is It, Anyway?, 92 Colum.

L. Rev. 725, 726 (1992) (footnote omitted) (citing Batson v. Kentucky, 476 U.S. 79, 85–

87 (1986)). The United States Supreme Court recently reaffirmed this understanding,

which flows directly from the Court’s holding in Strauder:

 In the words of the Strauder Court: ‘The very fact that
 colored people are singled out and expressly denied by a
 statute all right to participate in the administration of the
 law, as jurors, because of their color, though they are
 citizens, and may be in other respects fully qualified, is
 practically a brand upon them, affixed by the law, an
 assertion of their inferiority, and a stimulant to that race
 prejudice which is an impediment to securing to
 individuals of the race that equal justice which the law
 aims to secure to all others.’ For those reasons, the Court
 ruled that the West Virginia statute excluding blacks from
 jury service violated the Fourteenth Amendment.

Flowers, 139 S. Ct. at 2239 (cleaned up) (quoting Strauder v. West Virginia, 100 U.S.

303, 308 (1879)). On numerous other occasions the United States Supreme Court has

made clear that the equal protection rights of excluded jurors are also recognized and

can be asserted by third parties. See, e.g., Edmonson v. Leesville Concrete Co., 500

U.S. 614, 629–30 (1991) (prospective jurors have an equal protection right to be free

of race-based jury selection in civil cases as well as criminal cases); Powers v. Ohio,

499 U.S. 400, 425 (1991) (rights of excluded jurors can be invoked by one civil litigant

against another, and by a criminal defendant of a different race from that of the
 STATE V. CLEGG

 2022-NCSC-11

 Earls, J., concurring

 excluded juror).

¶ 103 In Powers, the Court explained that while an individual does not have a right

 to be chosen to sit on any particular jury, they do have a right not to be excluded from

 jury service because of their race. Powers, 499 U.S. at 409.

 It is suggested that no particular stigma or dishonor
 results if a prosecutor uses the raw fact of skin color to
 determine the objectivity or qualifications of a juror. We do
 not believe a victim of the classification would endorse this
 view; the assumption that no stigma or dishonor attaches
 contravenes accepted equal protection principles. Race
 cannot be a proxy for determining juror bias or competence.
 “A person’s race simply ‘is unrelated to his fitness as a
 juror.’ ”

 Id. at 410 (quoting Batson, 476 U.S. at 87). Thus, “[a] venireperson excluded from

 jury service because of race suffers a profound personal humiliation heightened by its

 public character.” Id. at 413–14. Although not evidence in the record of this case, the

 following material submitted with an amicus brief in the Batson case is illustrative

 of the harm to prospective jurors:

 In November of 1984, a person summoned for jury service
 in Brooklyn, New York, wrote a letter to the District
 Attorney complaining about race discrimination in jury
 selection. The person wrote that in a murder case against
 a Hispanic defendant, a majority of the prospective jurors
 were black, but an all-white jury was chosen, and it
 appeared to the writer that black jurors were being
 excluded on the basis of race. The writer asked: ‘If we
 Blacks don't have common sense and don't know how to be
 fair and impartial, why send these summonses to us? Why
 are we subject to fines of $ 250.00 if we don't appear and
 told it's our civic duty if we ask to be excused? Why bother
 STATE V. CLEGG

 2022-NCSC-11

 Earls, J., concurring

 to call us down to these courts and then overlook us like a
 bunch of naive or better yet ignorant children? We could be
 on our jobs or in schools trying to help ourselves instead of
 in courthouse halls being made fools of.’

 Underwood, Ending Race Discrimination, at 745. While it is inevitably a burden,

 “with the exception of voting, for most citizens the honor and privilege of jury duty is

 their most significant opportunity to participate in the democratic process.” Powers,

 499 U.S. at 407. One of the principal justifications for retaining the jury system is

 that it provides an opportunity for ordinary citizens “to participate in the

 administration of justice.” Id. at 406 (citing Duncan v. Louisiana, 391 U.S. 145, 147-

 58 (1968)). Therefore, to be excluded from that opportunity based on one’s race creates

 a unique kind of irreparable harm. See also Edmonson, 500 U.S. at 628 (“If

 peremptory challenges based on race were permitted, persons could be required by

 summons to be put at risk of open and public discrimination as a condition of their

 participation in the justice system. The injury to excluded jurors would be the direct

 result of governmental delegation and participation.”)

¶ 104 Considering this harm, we should examine the parties’ arguments and decide

 whether the prosecutor’s decision to use a peremptory challenge to exclude Ms.

 Jeffreys was an equal protection violation. As the majority explains, on remand the

 trial court found that the prosecutor had offered a race-neutral reason for excluding

 Ms. Jeffreys, namely that she was previously employed as a nurse at Dorothea Dix

 Hospital and therefore may be sympathetic to Mr. Clegg’s mental health issues. This
 STATE V. CLEGG

 2022-NCSC-11

 Earls, J., concurring

 is a race-neutral explanation supported by the record and satisfies the State’s burden

 of production under Batson’s second step.

¶ 105 In examining whether this explanation is persuasive, under Batson’s third

 step, additional facts are significant to provide context. The trial court found that

 Ms. Jeffreys’s employment at Dorothea Dix Hospital was “rationally related to the

 Defendant’s potential competency issues.” However, Mr. Clegg’s competency issues

 had already been resolved pre-trial, as the court had already determined that he was

 competent to stand trial and there was no reason to believe that the jury would hear

 about or have anything to decide about his competency. Significantly, the prosecutor

 did not ask any other juror if they had experience with mental health or competency

 issues. See Miller-El v. Dretke, 545 U.S. 231, 246 (2005) (“[T]he State's failure to

 engage in any meaningful voir dire examination on a subject the State alleges it is

 concerned about is evidence suggesting that the explanation is a sham and a pretext

 for discrimination[.]” (first alteration in original) (quoting Ex parte Travis, 776 So. 2d

 874, 881 (Ala. 2000))). These facts alone are sufficient to demonstrate that the

 prosecutor’s race-neutral explanation is pretextual.

¶ 106 However, the trial court erred in failing to acknowledge and factor into its

 analysis statistics cited by Mr. Clegg on remand which showed that prior to his trial

 in 2016, from 2011 to 2012, Wake County prosecutors struck Black prospective jurors

 at 1.7 times the rate of white prospective jurors in all jury trials in North Carolina
 STATE V. CLEGG

 2022-NCSC-11

 Earls, J., concurring

 during that year. This information is relevant to determining whether discrimination

 has occurred in this particular case. See State v. Hobbs, 374 N.C. 345, 359–60 (2020)

 (trial court erred in failing to weigh historical evidence of racial discrimination in jury

 selection); see also Flowers v. Mississippi, 139 S. Ct. at 2245 (“Most importantly for

 present purposes, after Batson, the trial judge may still consider historical evidence

 of the State’s discriminatory peremptory strikes from past trials in the jurisdiction,

 just as Swain had allowed.)

¶ 107 Considering the very localized and specific statistical evidence of the racially

 disparate use of peremptory challenges by prosecutors, the statewide data that was

 acknowledged by the trial court, the lack of any documented reason to exclude Ms.

 Jeffreys beyond a reason that appears to be pretextual, and the fact that the

 prosecutor here used two of his four peremptory challenges to strike all of the Black

 female prospective jurors,1 it was clearly error for the trial court to conclude that Mr.

 Clegg failed to carry his burden of demonstrating racial discrimination in the

 prosecutor’s use of a peremptory challenge to exclude Ms. Jeffreys from the jury. Cf.

 Snyder v. Louisiana, 552 U.S. 472, 485, 478 (2008) (a trial court’s finding of

 discrimination against one juror is evidence of discrimination against other jurors).

 1 The State exercised four peremptory strikes: Viola Jeffreys, Gwendolyn Aubrey,
 Joseph Barello, and Brian Williams. The State struck 10%–11% of eligible white jurors (2/19)
 and 66% of eligible non-white jurors (2/3). All the women of color called to serve were stricken
 by the State.
 STATE V. CLEGG

 2022-NCSC-11

 Earls, J., concurring

¶ 108 The State also asserted that it excluded Ms. Jeffreys, as it did Ms. Aubrey,

 because of her “body language and failure to make eye contact” without further

 elaboration of what about Ms. Jeffreys’ body language explained the decision to

 exclude her from the jury. The trial court concluded that this justification could not

 be supported by the record because there was not “an adequate record of the body

 language of the prospective juror.”

¶ 109 In addition to the inadequate record, I would follow other courts that have

 found such explanations insufficient to constitute a valid, race-neutral explanation.

 See, e.g., State v. Giles, 407 S.C. 14, 20–22 (2014) (explanation provided by proponent

 of a peremptory challenge at second step of Batson process must be clear and

 reasonably specific to be legally sufficient); Zakour v. UT Med. Grp., Inc., 215 S.W.3d

 763, 775 (Tenn. 2007) (finding explanation that six prospective female jurors were

 stricken because of their body language, without providing more detail, was not clear,

 reasonably specific, legitimate and reasonably related to the particular case being

 tried); Spencer v. State, 238 So. 3d 708, 712 (Fla. 2018) (under Florida law, second

 step of Batson requires prosecutor to identify “clear and reasonably specific” race-

 neutral explanation that is related to case being tried (quoting State v. Slappy, 522

 So.2d 18, 22 (Fla. 1988))), cert. denied, 138 S. Ct. 2637. I would therefore hold that

 that a general reference to a person’s body language without more and particularly

 without documentation of such facts on the record, is not a valid race-neutral
 STATE V. CLEGG

 2022-NCSC-11

 Earls, J., concurring

 explanation of a peremptory challenge that satisfies the second step of Batson even

 under the standard set by the United States Supreme Court in its decision in Purkett

 v. Elem, 514 U.S. 765 (1995).

¶ 110 The Purkett Court took a very broad approach to the second step, suggesting

 that virtually any race-neutral explanation, if “plausible,” is satisfactory. Purkett, 514

 U.S. at 768. However, the Court has also explained that ‘seat-of-the-pants instincts’

 may often be just another term for racial prejudice.” Batson, 476 U.S. at 106

 (Marshall, J., concurring). The Washington Supreme Court has specifically identified

 “body language” and “failing to make eye contact” as reasons for a peremptory

 challenge that historically have been “associated with improper discrimination in

 jury selection” and required that if any party intends to offer such a reason for a

 peremptory challenge, notice must be provided to the court and the other parties “so

 the behavior can be verified and addressed in a timely manner.” Wash. Gen. R. 37(i).

 Moreover, “[a] lack of corroboration by the judge or opposing counsel verifying the

 behavior shall invalidate the given reason for the peremptory challenge.” Id.

 Therefore, I agree with the Louisiana Supreme Court and others that have held that

 a general explanation, such as body language cannot be a satisfactory race-neutral

 explanation because “[s]uch an all inclusive reason falls far short of an articulable

 reason that enables the trial judge to assess the plausibility of the proffered reason

 for striking a potential juror.” Alex v. Rayne Concrete Serv., 2005-1457 (La. 1/26/07);
 STATE V. CLEGG

 2022-NCSC-11

 Earls, J., concurring

 951 So. 2d 138, 153. Indeed, “[i]f trial courts were required to find any reason given

 not based on race satisfactory, only those who admitted point-blank that they

 excluded veniremen because of their race would be found in violation of the

 Fourteenth Amendment’s guarantee of equal protection.” Id. at 154 (quoting State v.

 Collier, 553 So. 2d 815, 821 (La. 1989)).

¶ 111 More generally, guaranteeing that juries are selected without racial bias is

 important to the administration of justice not only for the rights of the litigants and

 the rights of prospective jurors, but also for the legitimacy of the court system itself.

 Taylor v. Louisiana, 419 U.S. 522, 530–31 (1975) (fair representation of juries is

 essential to (1) guard against the exercise of “arbitrary power” and by invoking the

 “commonsense judgment of the community as a hedge against the overzealous or

 mistaken prosecutor,” (2) uphold “public confidence in the fairness of the criminal

 justice system,” and (3) share the administration of justice which “is a phase of civic

 responsibility”).

¶ 112 When racial bias infects jury selection, it is an affront to individual dignity and

 removes important voices from the justice system. Writing nearly one hundred years

 ago, Chief Justice Taft explained:

 The jury system postulates a conscious duty of
 participation in the machinery of justice . . . . One of its
 greatest benefits is in the security it gives the people that
 they, as jurors actual or possible, being part of the judicial
 system of the country can prevent its arbitrary use or
 abuse.
 STATE V. CLEGG

 2022-NCSC-11

 Earls, J., concurring

Balzac v. Porto Rico, 258 U.S. 298, 310 (1922). More recently, when expanding Batson

to the civil context, Justice Kennedy explained why eliminating racial bias in

courtroom is fundamental:

 Few places are a more real expression of the constitutional
 authority of the government than a courtroom, where the
 law itself unfolds. Within the courtroom, the government
 invokes its laws to determine the rights of those who stand
 before it. In full view of the public, litigants press their
 cases, witnesses give testimony, juries render verdicts, and
 judges act with the utmost care to ensure that justice is
 done.

 Race discrimination within the courtroom raises
 serious questions as to the fairness of the proceedings
 conducted there. Racial bias mars the integrity of the
 judicial system and prevents the idea of democratic
 government from becoming a reality.

Edmonson, 500 U.S. at 628. Just four years ago, in overturning a conviction rendered

by a jury that was found to have based its decision explicitly on the defendant’s race,

the Court again explained the significance of the jury in our legal system and our

democracy:

 The jury is a central foundation of our justice system
 and our democracy. Whatever its imperfections in a
 particular case, the jury is a necessary check on
 governmental power. The jury, over the centuries, has been
 an inspired, trusted, and effective instrument for resolving
 factual disputes and determining ultimate questions of
 guilt or innocence in criminal cases. Over the long course
 its judgments find acceptance in the community, an
 acceptance essential to respect for the rule of law. The jury
 is a tangible implementation of the principle that the law
 STATE V. CLEGG

 2022-NCSC-11

 Earls, J., concurring

 comes from the people.

Pena-Rodriguez v. Colorado, 137 S. Ct. 855, 860 (2017). Given the importance of fair

jury selection processes, it is incumbent on this Court to take reasonable steps to

address the obstacles we face. We must acknowledge that this Court’s Batson

jurisprudence has not been effective. This case is the first case where we have

reversed a conviction on Batson grounds. The record is clear:

 Since 1986, and as of September 6, 2016, the
 Supreme Court of North Carolina has decided seventy-four
 cases on the merits in which it adjudicated eighty-one
 Batson claims raised by criminal defendants over alleged
 racial discrimination against minority jurors in the State’s
 exercise of peremptory challenges at criminal trials. To
 date, that [C]ourt has not found a substantive Batson
 violation in any of those cases. In seventy-one of those
 seventy-four cases, that [C]ourt found no Batson error
 whatsoever. In the three remaining cases, that [C]ourt held
 the trial court erred at Batson’s first step in finding no
 prima facie case existed and conducted or ordered further
 review. However, none of these three cases has ultimately
 resulted in the holding of a substantive Batson violation.

Daniel R. Pollitt & Brittany P. Warren, Thirty Years of Disappointment: North

Carolina’s Remarkable Appellate Batson Record, 94 N.C. L. Rev. 1957, 1961 (2016)

(footnotes omitted). Faced with a similarly stark record, the Washington Supreme

Court observed in 2013 that its experience was “rather shocking and underscores the

substantial discretion that is afforded to trial courts under Batson. And while this

alone does not prove that Batson is failing, it is highly suggestive in light of all the

other evidence that race discrimination persists in the exercise of peremptories.”
 STATE V. CLEGG

 2022-NCSC-11

 Earls, J., concurring

 State v. Saintcalle, 178 Wash. 2d 34, 46, 309 P.3d 326, 335, cert. denied, 571 U.S. 1113

 (2013), and overruled in part on other grounds by Seattle v. Erickson, 188 Wash. 2d

 721, 398 P.3d 1124 (2017); see also Miller-El, 545 U.S. at 268–70 (Breyer, J.,

 concurring) (reviewing the body of evidence showing that Batson has done very little

 to prevent prosecutors from exercising race-based challenges).

¶ 113 Justice Marshall predicted that “[m]erely allowing defendants the opportunity

 to challenge the racially discriminatory use of peremptory challenges in individual

 cases will not end the illegitimate use of the peremptory challenge.” Batson, 476 U.S.

 at 105 (Marshall, J., concurring). In brief, and perhaps stating the obvious, the

 Batson framework makes it very difficult for litigants to prove intentional

 discrimination, “even where it almost certainly exists.” Erickson, 188 Wash. 2d at

 735–36, 398 P.3d at 1131–32 (quoting Saintcalle, 178 Wash. 2d at 46, 309 P.3d at

 335). Batson also completely fails to address peremptory strikes that occur due to

 implicit or unconscious bias,2 as Marshall pointed out when referencing prosecutors’

 and judges’ “conscious or unconscious” bias. Batson, 476 U.S. at 106 (Marshall, J.,

 concurring). Other natural human inclinations also make it difficult for counsel to

 assert that a member of the bar is acting out of purposeful discrimination3 and judges

 2 See, e.g., Samuel R. Sommers & Michael I. Norton, Race-Based Judgments, Race-

 Neutral Justifications: Experimental Examination of Peremptory Use and the Batson
 Challenge Procedure, 31 Law & Hum. Behav. 261, 266–67 (2007).
 3 Mr. Batson had to insist that his counsel “object anyway” to the prosecutor’s use of

 peremptory challenges during jury selection at his trial. Sean Rameswaram, Object Anyway,
 STATE V. CLEGG

 2022-NCSC-11

 Earls, J., concurring

 are reluctant to sustain such objections. Cf. People v. Gutierrez, 2 Cal. 5th 1150, 1183,

 395 P.3d 186, 208 (2017) (Liu, J., concurring) (“[I]t is more likely than not that one or

 more strikes were improperly motivated. But I do not think the finding of a violation

 should brand the prosecutor a liar or a bigot. Such loaded terms obscure the systemic

 values that the constitutional prohibition on racial discrimination in jury selection is

 designed to serve.”).

¶ 114 Appellate judges are similarly uncomfortable overturning jury verdicts,

 especially when the crimes charged are extremely serious. The fact that the first time

 this Court has ever vacated a conviction on Batson grounds occurs here where Mr.

 Clegg has already completely served his time is indicative of why the Batson

 framework has failed to adequately address the constitutional violation

 acknowledged by the United States Supreme Court in Strauder v. West Virginia, 100

 U.S. 303, 310 (1880).

¶ 115 Indeed, in 1986 Justice Marshall stated that “[t]he decision today will not end

 the racial discrimination that peremptories inject into the jury-selection process.

 That goal can be accomplished only by eliminating peremptory challenges entirely.”

 Batson, 476 U.S. at 102–03 (Marshall, J., concurring). The Arizona Supreme Court

 has taken this observation seriously and, by general rule, has eliminated the use of

 More Perfect Podcast (July 16, 2016), interview of James Batson,
 https://www.wnycstudios.org/podcasts/radiolabmoreperfect/episodes/object-anyway.
 STATE V. CLEGG

 2022-NCSC-11

 Earls, J., concurring

 peremptory challenges in civil and criminal trials. See Order Amending Rules 18.4

 and 18.5 of the Rules of Criminal Procedure, and Rule 47(e) of the Rules of Civil

 Procedure, Ariz. Sup. Ct. No. R-21-0020 (Aug. 30, 2021). Washington State’s General

 Rule 37, adopted by the Washington Supreme Court in 2018, establishes a new

 standard and identifies presumptively invalid reasons for peremptory challenges that

 have been associated with improper discrimination in the past. Wash. Gen. R. 37(i);

 see also State v. Jefferson, 192 Wash. 2d 225, 242, 429 P.3d 467, 476 (2018)

 (identifying Batson’s deficiencies and asserting the court’s “inherent authority to

 adopt such procedures to further the administration of justice”). The Connecticut

 Supreme Court established a jury selection task force to review the problems with

 Batson that it carefully outlined in its opinion in State v. Holmes, 334 Conn. 202, 221

 A.3d 407 (2019), and to propose necessary solutions. See Holmes, 334 Conn. at 250,

 221 A.3d at 436–37.

¶ 116 Social science research indicates that

 compared to diverse juries, all white juries tend to spend
 less time deliberating, make more errors, and consider
 fewer perspectives. In contrast, diverse juries were
 significantly more able to assess reliability and credibility,
 avoid presumptions of guilt, and fairly judge a criminally
 accused. By every deliberation measure heterogeneous
 groups outperformed homogeneous groups. These studies
 confirm what seems obvious from reflection: more diverse
 juries result in fairer trials.
 STATE V. CLEGG

 2022-NCSC-11

 Earls, J., concurring

Id. at 235 (cleaned up) (quoting Saintcalle, 178 Wash. 2d at 50, 309 P.3d at 337).4 As

in other jurisdictions, “this appeal presents us with an occasion to consider whether

further action on our part is necessary to promote public confidence in the perception

of our state’s judicial system with respect to fairness to both litigants and their fellow

citizens.” Id. at 236. If we are to give more than lip service to the principle of equal

justice under the law, we should not bury our heads in the sand and pretend that

thirty-five years of experience with Batson will magically change. There are a variety

of tools at our disposal, we urgently need to use them.

 4 See, e.g., Samuel R. Sommers & Phoebe C. Ellsworth, How Much Do We Really Know

About Race and Juries? A Review of Social Science Theory and Research, 78 Chi.-Kent L. Rev.
997 (2003); Samuel R. Sommers, Determinants and Consequences of Jury Racial Diversity:
Empirical Findings, Implications, and Directions for Future Research, 2 Soc. Issues & Pol’y
Rev., no. 1, 2008, at 65–102; Samuel R. Sommers, On Racial Diversity and Group Decision
Making: Identifying Multiple Effects of Racial Composition on Jury Deliberations, 90 J. of
Personality & Soc. Psych., no. 4, 2006, at 597–612.
 Justice BERGER dissenting.

¶ 117 “[T]he back and forth of a Batson hearing can be hurried, and prosecutors can

 make mistakes when providing explanations [for the use of peremptory challenges].

 That is entirely understandable, and mistaken explanations should not be confused

 with racial discrimination.” Flowers v. Mississippi, 139 S. Ct. 2228, 2250, 204 L. Ed.

 2d 638, 663 (2019) (emphasis added). This is plainly apparent because “Batson

 prohibits purposeful discrimination, not honest, unintentional mistakes.” Aleman v.

 Uribe, 723 F.3d 976, 982 (9th Cir. 2013).

¶ 118 Trial court judges are uniquely positioned to consider and evaluate whether

 peremptory strikes are the product of purposeful discrimination. The Supreme Court

 has “recognized that these determinations of credibility and demeanor lie peculiarly

 within a trial judge’s province.” Flowers, 139 S. Ct. at 2244, 204 L. Ed. 2d at 656

 (quoting Snyder v. Louisiana, 552 U.S. 472, 477, 128 S. Ct. 1203, 1208 (2008)).

 Because “the trial judge’s findings in the context under consideration here largely

 will turn on evaluation of credibility, a reviewing court ordinarily should give those

 findings great deference.” Batson v. Kentucky, 476 U.S. 79, 98 n.21, 106 S. Ct. 1712,

 1724 n.21 (1986).

¶ 119 Consistent with precedent, the trial court evaluated the explanations provided

 by the prosecutor for the strikes of Ms. Viola Jeffreys and Ms. Gwendolyn Aubrey.

 Based upon the entire record, the trial court determined that the mistaken
 STATE V. CLEGG

 2022-NCSC-11

 Berger, J., dissenting

 explanation provided was indeed “an instance of a prosecutor misremembering,” not

 purposeful discrimination. The majority agrees that the explanation provided by the

 prosecutor was a mistake, yet reaches its desired result by distorting precedent, and

 mischaracterizing the record and the trial court order.

¶ 120 The question presented by this case is whether a mistaken explanation offered

 by an attorney during step two of a Batson inquiry is sufficient for the opponent of a

 peremptory strike to demonstrate purposeful racial discrimination. The mistaken

 explanation provided by the prosecutor cannot, by definition, be purposeful

 discrimination.

¶ 121 Because the trial court’s order should be affirmed, I respectfully dissent.

 I. Factual Background

¶ 122 There is no question in this case as to defendant’s guilt.1 It is uncontroverted

 that on January 25, 2014, defendant robbed a Wake County business at gun point.

 Defendant threatened to kill the employee, a black female, and he pointed a firearm

 at her stomach. After only receiving $85 from the cash register, defendant pressed

 the firearm against the employee’s neck. Defendant then noticed a safe, and he

 pointed the firearm at the employee’s left temple and ordered her to open it.

 Defendant fled the scene when the employee did not have the combination to the safe.

 1 The only two arguments made by defendant in the Court of Appeals concerned the

 Batson argument at issue here, and his contention that the victim-impact testimony was not
 relevant.
 STATE V. CLEGG

 2022-NCSC-11

 Berger, J., dissenting

¶ 123 Defendant was tried and convicted of robbery with a dangerous weapon.

 During jury selection, defendant objected to use of peremptory challenges by the

 prosecutor against two black females, Ms. Viola Jeffreys and Ms. Gwendolyn Aubrey.

 The prosecutor struck Ms. Jeffreys due to her work history with Dorothea Dix

 Hospital. When the prosecutor explained his strike of Ms. Aubrey, the prosecutor

 provided a mistaken explanation. The prosecutor said that “when I asked her if she

 could be fair and impartial, her answer was ‘I suppose.’ I wasn’t confident that she

 was confident that she could be fair and impartial.” The problem, however, is that

 Ms. Aubrey was not asked if she could be fair and impartial; instead, Ms. Aubrey

 answered “I suppose” when responding to a question concerning her ability to focus

 during the trial.

 II. Analysis

¶ 124 Peremptory challenges “are challenges which may be made or omitted

 according to the judgment, will, or caprice of the party entitled thereto[.]” State v.

 Smith, 291 N.C. 505, 526, 231 S.E.2d 663, 676 (1977). “The essential nature of the

 peremptory challenge denotes that it is a challenge exercised without a reason stated,

 without inquiry and without being subject to the court’s control.” Id. Peremptory

 challenges “permit rejection for a real or imagined partiality,” id., subject to the

 limitations set forth in the Batson line of cases.
 STATE V. CLEGG

 2022-NCSC-11

 Berger, J., dissenting

¶ 125 Under Batson, “[o]nce the opponent of a peremptory challenge has made out a

 prima facie case of racial discrimination (step one), the burden of production shifts to

 the proponent of the strike to come forward with a race-neutral explanation (step

 two).” Purkett v. Elem, 514 U.S. 765, 767, 115 S. Ct. 1769, 1770–71 (1995). “The

 ultimate inquiry is whether the State was ‘motivated in substantial part by

 discriminatory intent.’ ” State v. Hobbs, 374 N.C. 345, 353, 841 S.E.2d 492, 499 (2020)

 (quoting Foster v. Chatman, 578 U.S. 488, 513, 136 S. Ct. 1737, 1754 (2016)).

¶ 126 It is in step three of the Batson analysis that the trial court determines

 whether purposeful discrimination was the motivation for the peremptory strike.

 Flowers, 139 S. Ct. at 2241, 204 L. Ed. 2d at 655. “It is the honesty of the prosecutor’s

 explanation—and that alone—which a trial judge must assess at the third step of

 the Batson analysis.” Lamon v. Boatwright, 467 F.3d 1097, 1102 (7th Cir. 2006).

¶ 127 “As in any equal protection case, the ‘burden is, of course,’ on the defendant

 who alleges discriminatory selection of the venire ‘to prove the existence of purposeful

 discrimination.’ ” Batson, 476 U.S. at 93, 106 S. Ct. at 1721 (quoting Whitus v.

 Georgia, 385 U.S. 545, 550, 87 S. Ct. 643, 646–47 (1967)). The burden of proof “rests

 with, and never shifts from, the opponent of the strike.” Johnson v. California, 545

 U.S. 162, 171, 125 S. Ct. 2410, 2417 (2005) (quoting Purkett, 514 U.S. at 768, 115 S.

 Ct. at 1769 (per curiam)).
 STATE V. CLEGG

 2022-NCSC-11

 Berger, J., dissenting

¶ 128 A “trial judge’s assessment of the prosecutor’s credibility is often important.”

 Flowers, 139 S. Ct. at 2243–44, 204 L. Ed. 2d at 656. The Supreme Court has

 “recognized that these determinations of credibility and demeanor lie peculiarly

 within a trial judge’s province.” Id. at 2244, 204 L. Ed. 2d at 656 (quoting Snyder,

 552 U.S. at 477, 128 S. Ct. at 1208). “On appeal, a trial court’s ruling on the issue of

 discriminatory intent must be sustained unless it is clearly erroneous.” Snyder, 552

 U.S. at 479, 128 S. Ct. 1203; accord State v. Lawrence, 352 N.C. 1, 14, 530 S.E.2d 807,

 816 (2000). This Court has stated that “where there are two permissible views of the

 evidence, the fact-finder’s choice between them cannot be clearly erroneous.” State v.

 Thomas, 329 N.C. 423, 433, 407 S.E.2d 141, 148 (1991) (quoting Anderson v. Bessemer

 City, 470 U.S. 564, 574, 105 S. Ct. 1504, 1511, 84 L.Ed.2d 518, 528 (1985)); see also

 Hobbs, 374 N.C. at 366–67, 841 S.E.2d at 508 (Newby, J., dissenting).

¶ 129 Because “the trial judge’s findings in the context under consideration here

 largely will turn on evaluation of credibility, a reviewing court ordinarily should give

 those findings great deference.” Batson, 476 U.S. at 98 n.21, 106 S. Ct. 1712 n.21; see

 also Flowers, 139 S. Ct. at 2244, 204 L. Ed. 2d at 656 (“The [Supreme] Court has

 described the appellate standard of review of the trial court’s factual determinations

 in a Batson hearing as highly deferential.) (cleaned up); Foster, 578 U.S. at 500, 136

 S. Ct. at 1747 (the third step “turns on factual determinations, and, in the absence of

 exceptional circumstances, we defer to state court factual findings unless we conclude
 STATE V. CLEGG

 2022-NCSC-11

 Berger, J., dissenting

 that they are clearly erroneous.”) (cleaned up); Hernandez v. New York, 500 U.S. 352,

 364, 368 111 S. Ct. 1859, 1868–69, 1871 (1991) (discussing the Supreme Court’s

 “respect for factual findings made by state courts” and the “deference to state-court

 factual determinations, in particular on issues of credibility.”); and Lawrence, 352

 N.C. at 14, 530 S.E.2d at 816 (because the third Batson step “is essentially a question

 of fact, the trial court’s decision as to whether the prosecutor had a discriminatory

 intent is to be given great deference[.]”).

 A. Viola Jeffreys

¶ 130 Again, the two prospective jurors at issue here are Ms. Viola Jeffreys and Ms.

 Gwendolyn Aubrey. Ms. Jeffreys was struck due to her work history with Dorothea

 Dix Hospital. The relevant portions of the transcript are set forth below.2

 THE COURT: Ms. Jeffreys, can you tell us
 about yourself, ma’am?

 [Ms. Jeffreys]: I live on [REDACTED].

 ....

 THE COURT: And do you work, employed,
 either at home or outside the home?

 [Ms. Jeffreys]: No, retired.

 THE COURT: What type of work did you do
 before you retired?

 2 The trial court initially questioned prospective jurors before allowing the parties to

 engage in voir dire.
 STATE V. CLEGG

 2022-NCSC-11

 Berger, J., dissenting

[Ms. Jeffreys]: I was a nurse aide at Dorothea
Dix.

....

[The State]: Ms. Jeffreys, I’m going to call
you out. I wanted to ask you about your work as a
nurse’s aide, is that right, at Dorothea Dix?

[Ms. Jeffreys]: Dorothea Dix, yes.

[The State]: How long did you do that?

[Ms. Jeffreys]: 14 years.

[The State]: And when did you stop working
there?

[Ms. Jeffreys]: I stopped there about seven
months ago.

[The State]: You stopped working there
about seven months ago?

[Ms. Jeffreys]: It had been about two years. I’m
sorry. About two years.

[The State]: About two years ago was when
you stopped working at Dorothea Dix? And I guess I
kind of know what a nurse’s aide does, but can you
elaborate a little bit?

[Ms. Jeffreys]: They care of the patient. We give
them baths and make sure they take medicine, stuff
like that.

[The State]: What type of ailments and –

[Ms. Jeffreys]: Mostly diabetes. . . . Patients
that have diabetes or something like that.
 STATE V. CLEGG

 2022-NCSC-11

 Berger, J., dissenting

¶ 131 It is uncontroverted that defendant argued pretrial motions related to his

 mental health issues. During voir dire, the prosecutor explained that he struck Ms.

 Jeffreys because of “the underlying issues that have been brought out so far, I found

 that maybe she would not be able to fairly assess the evidence in this case.” On

 remand, the prosecutor provided the same basis for use of the peremptory challenge—

 that based on mental health issues put forth by defendant, Ms. Jeffreys may be

 sympathetic to defendant’s case because of her work history at a mental health

 institution.

¶ 132 The trial court found that the prosecutor had provided a race-neutral reason

 for striking Ms. Jeffreys “based upon [her] employment history as a nurse’s aide at

 Dorothea Dix Hospital.” The trial court further found that “[d]efendant’s competency

 had been called into question and evaluations ordered [, and] the State’s stated basis

 for striking Ms. Jeffreys due to her work history in the mental health field is

 rationally related to [d]efendant’s potential competency issues.” Finally, the trial

 court found that the reason for striking Ms. Jeffreys was “supported by the record

 and constitutes an appropriate justification for the strike.”

¶ 133 The prosecutor’s questions of Ms. Jeffreys were focused on her work at

 Dorothea Dix, which was a state-operated psychiatric hospital. Ms. Jeffreys was the

 only prospective juror who indicated she worked or had worked in a mental health

 facility.
 STATE V. CLEGG

 2022-NCSC-11

 Berger, J., dissenting

¶ 134 In overruling defendant’s Batson challenge as it relates to Ms. Jeffreys, the

 trial court concluded as a matter of law that defendant “had not established that it is

 more likely than not that the State engaged in purposeful discrimination[.]” The trial

 court’s determination as to Ms. Jeffreys was not clearly erroneous and should be

 affirmed.

¶ 135 The majority mentions Ms. Jeffreys more than thirty times in its opinion, but

 they do not analyze or even consider the legitimate reasons for her strike because

 doing so destroys their narrative. To be clear, there is no determination by the

 majority that the prosecutor’s strike of Ms. Jeffreys was motivated by race. However,

 the majority uses carefully selected portions of the record, including Ms. Jeffreys’s

 demographic information, to lump her in with the discussion of Ms. Aubrey, implying

 that both strikes were based on race. While the cherry-picked facts and

 circumstances may be helpful to their desired result, analysis of Ms. Jeffreys’ strike

 is required for a proper review. See Flowers, 139 S. Ct. at 2251, 204 L. Ed. 2d at 664

 (in a Batson analysis, an appellate court is to review “all of the relevant facts and

 circumstances taken together.”); see also State v. Bennett, 374 N.C. 579, 339 (2005)

 (“clear error” review is based “on the entire evidence.”).3 The majority’s failure to

 3 The majority actually quotes this portion of Bennett in its analysis, yet declines to

 analyze the strike of Ms. Jeffreys.
 STATE V. CLEGG

 2022-NCSC-11

 Berger, J., dissenting

 include an intellectually honest analysis of Ms. Jeffreys’ strike demonstrates just one

 reason why the opinion is jurisprudentially suspect.

 B. Gwendolyn Aubrey

¶ 136 Similarly, defendant has failed to demonstrate purposeful discrimination in

 the use of a peremptory challenge for prospective juror Ms. Gwendolyn Aubrey. When

 the prosecutor explained his strike of Ms. Aubrey, the prosecutor provided a mistaken

 explanation. The prosecutor said that “when I asked her if she could be fair and

 impartial, her answer was ‘I suppose.’ ” I wasn’t confident that she was confident

 that she could be fair and impartial.” The voir dire of Ms. Aubrey is set forth below.4

 THE COURT: Ms. Aubrey, can you tell us a
 little bit about yourself, ma’am?

 [Ms. Aubrey]: I live in south Raleigh. I work in
 the food service industry. I’ve not served on a jury
 before.

 THE COURT: Married? Single?

 [Ms. Aubrey]: Single.

 ....

 THE COURT: And anything going on in your
 life that would make it difficult or impossible for you
 to serve?

 [Ms. Aubrey]: Other than missing work, no.

 4 As with Ms. Jeffreys, the trial court initially questioned prospective jurors before
 allowing the parties to engage in voir dire.
 STATE V. CLEGG

 2022-NCSC-11

 Berger, J., dissenting

THE COURT: Missing work. Yes, ma’am. You
work daytime?

[Ms. Aubrey]: Day and night.

THE COURT: Yes, ma’am. All right. There will
be more questions about that, I’m sure, but thank
you for bringing that concern to our attention.

....

[The State]: As far as the new potential
jurors, any of you ever been the victim of a crime
before? Friends or family ever been the victim of any
crime? . . .

[Ms. Aubrey]: I had my car broken into once.

[The State]: And you said you did or
somebody—

[Ms. Aubrey]: I did.

[The State]: Can you say when that was?

[Ms. Aubrey]: I don’t know. Maybe like late
‘90s.

[The State]: Okay. Did you have any of your
belongings taken from you?

[Ms. Aubrey]: Yes, sir, I did.

[The State]: Do you know if anybody was
charged?

[Ms. Aubrey]: No.

[The State]: Did you ever get any of your
belongings back?
 STATE V. CLEGG

 2022-NCSC-11

 Berger, J., dissenting

[Ms. Aubrey]: No.

[The State]: Was it reported to law
enforcement?

[Ms. Aubrey]: No, sir, it wasn’t.

[The State]: It was not reported? Okay.

....

[The State]: Can you tell me just a little bit
about how you’re familiar with firearms?

[Ms. Aubrey]: I had an ex-boyfriend who was a
gun enthusiast and taught me how to shoot a gun.

[The State]: Do you own any firearms now?

[Ms. Aubrey]: No, sir.

[The State]: Do you ever shoot or handle
weapons, firearms, now?

[Ms. Aubrey]: No, sir.

....

[The State]: Okay. And Judge Ridgeway
asked you about things going on in your life, and I
just want to kind of follow up on that. We all have
our normal responsibilities in life. Is there anything
going on in your personal life—and I don’t need to
know specifically—you know, that would maybe
take you away mentally from being engaged in
what’s going on here in the courtroom? Again, I don’t
need to know specifics, but, you know, is there a
possibility that your mind could drift somewhere
 STATE V. CLEGG

 2022-NCSC-11

 Berger, J., dissenting

 else when we need you to be focusing on the
 proceedings here?

 ....

 [The State]: Okay. Ms. Aubrey, do you feel
 confident you can focus on what’s going on here?

 [Ms. Aubrey]: I suppose.

 [The State]: I want you to be confident about
 it. You just don’t want to be a juror or do you feel like
 if you were here, you could focus and do what we
 need you to do?

 [Ms. Aubrey]: I think so.

 [The State]: Okay. Thank you.

¶ 137 The State then excused Ms. Aubrey from the panel. Defense counsel objected

 to the use of peremptory challenges against Ms. Jeffreys and Ms. Aubrey, stating,

 “[t]he only distinction I see is color.”

¶ 138 The prosecutor then argued to the trial court:

 Judge, what I would tell you, first of all, I want to note that
 I think it’s very offensive that there’s an allegation being
 made that I’m excusing jurors for racial reasons. What I
 can tell you is that both the potential jurors in Seat No. 5,
 body language to me, they would not look at me. The most
 recent juror, Ms. Jeffreys—excuse me. Ms. Jeffreys was the
 first juror. The most recent juror, when I asked her if she
 could be fair and impartial, her answer was “I suppose.” I
 wasn’t confident that she was confident that she could be
 fair and impartial. The first juror, Ms. Jeffreys, talked
 about her experience as a nurse’s aide with Dorothea Dix.
 With some of the underlying issues that have been brought
 STATE V. CLEGG

 2022-NCSC-11

 Berger, J., dissenting

 out so far, I found that maybe she would not be able to
 fairly assess the evidence in this case.
 As Ms. Darrow pointed out, there’s been an equal
 number of white jurors and African-American jurors that
 have been excused. Based on their answers, based on their
 body language, based on their failure to look at me when I
 was trying to communicate with them, and also based on
 their answers with respect to the last juror, her not being
 confident that she could be fair and impartial, frankly, I
 think that would be potential reason to challenge her for
 cause.
 Other than that, Judge, that’s how the State is
 viewing the excusal of those jurors.

¶ 139 At trial, the objection lodged by defense counsel was overruled. Upon remand,

 the trial court found that “[i]t is evident from the record that both the trial court and

 the prosecutor’s memory of the answers given by Ms. Aubrey [were] conflated.” The

 trial court further found that

 [i]n retrospect, had the prosecutor, in offering his race-
 neutral basis for exercising the strike of Ms. Aubrey, stated
 that he was concerned that she had answered “I suppose”
 to the question of whether she could focus, when coupled
 with her concern that she worked “day and night” and
 would miss work, that, in the Court’s view, would have
 constituted a neutral justification for the strike.

¶ 140 In other words, the prosecutor and the trial court were mistaken about the

 question posed by the State and the response given by Ms. Aubrey, and that but for

 the mistaken explanation, the record revealed that there was a race-neutral

 explanation for the strike of Ms. Aubrey. This portion of the trial court’s order is far

 different from what the majority characterizes as the trial court “rejecting the ‘I
 STATE V. CLEGG

 2022-NCSC-11

 Berger, J., dissenting

 suppose’ rationale.” Nonetheless, the trial court, citing Miller-El v. Dretke, 545 U.S.

 231, 125 S. Ct. 2317 (2002), determined that it could not consider the incorrectly

 stated, but plainly apparent, reason for striking Ms. Aubrey.

¶ 141 The trial court then analyzed other reasons proffered by the prosecutor for the

 strike, including body language and lack of eye contact by Ms. Aubrey, purported

 disparities in use of peremptory challenges,5 and a comparison of the questions posed

 to white and black prospective jurors.6 As to body language and lack of eye contact,

 the trial court made no findings of fact during the original trial. Citing Snyder v.

 Louisiana, 552 US 472 (2008), the trial court determined that in the absence of a

 finding of fact on a prospective juror’s demeanor, the State’s race-neutral explanation

 for striking Ms. Aubrey had to fail.

 5 The trial court also referenced a study of peremptory challenges in capital trials from

 1990 to 2010 and non-capital cases from 2011–2012 in paragraphs 18 and 22. One could
 argue that this data is stale. Both of these studies are more than ten years old, and,
 presumably, some of the data used in the capital case study is more than thirty years old.
 Certainly, North Carolina’s people, population, and attitudes have changed over the last
 thirty years. The majority seemingly acknowledges this point in footnote 9. Perhaps it is
 time for an updated, independent study of jury selection commissioned by the Administrative
 Office of the Courts.
 6 It seems obvious, but jury selection typically involves general questioning of

 prospective jurors to probe basic information. Based on responses, individual prospective
 jurors may, not shall, receive follow-up questions. The majority focuses on disparate
 questioning in its findings. However, “disparate questioning or investigation alone does not
 constitute a Batson violation.” Flowers v. Mississippi, 139 S. Ct. 2228, 2248, 204 L. Ed. 2d
 638, 661 (2019). The proper standard is “dramatically disparate questioning” id., which is
 not present here.
 STATE V. CLEGG

 2022-NCSC-11

 Berger, J., dissenting

¶ 142 While the trial court may have taken the holding in Miller-El too literally when

 it determined that it could not consider the mistaken explanation provided by the

 prosecutor, the trial court’s ultimate conclusion was correct. The trial court clearly

 set forth its reasoning, making the types of credibility determinations contemplated

 by the Supreme Court of the United States and by this Court, and the trial court’s

 decision is entitled to great deference.

¶ 143 The majority acknowledges what is plainly apparent from the record and the

 trial court’s order - that the prosecutor’s explanation for the strike of Ms. Aubrey was

 a “mistake.” If “Batson and its progeny direct trial judges to assess the honesty-not

 the accuracy-of a proffered race-neutral explanation,” Lamon, 467 F.3d at

 1101(emphasis in original), and the majority acknowledges this was a mistake, the

 strike cannot be the result of purposeful discrimination. See Bethea v.

 Commonwealth, 297 Va. 730, 754, 831 S.E.2d 670, 682 (2019) (a “prosecutor’s race-

 neutral reason cannot at the same time be both an unintentional mistake and a

 pretextual, purposeful misrepresentation.”).

¶ 144 Defendant has not shown purposeful discrimination or bad faith in the

 prosecutor’s mistaken explanation; it is only theorized by the majority. Yet, the

 majority finds the prosecutor’s mistaken explanations here were “shifting” and

 “plainly unsupported by the record.” The majority then erroneously postulates that

 because the race-neutral explanations failed, the only remaining evidence must be
 STATE V. CLEGG

 2022-NCSC-11

 Berger, J., dissenting

 given weight and that it must be assigned to defendant. It is the factfinder that

 assigns weight to evidence, and the factfinder can assign as much or as little weight

 as it determines appropriate. That is not a higher burden.

¶ 145 Moreover, the majority’s disparate questioning analysis is internally

 inconsistent. The majority here expressly recognizes that there is an explanation for

 the prosecutor’s questioning of Mr. Williams that “is not completely without merit.”

 Indeed, the trial court found that the side-by-side comparison between Mr. Williams

 and Ms. Aubrey was not “particularly pertinent” as Mr. Williams had previously

 mentioned he could juggle things around while Ms. Aubrey “did not indicate any

 flexibility in her ‘day and night’ work schedule that might ease her concern about

 missing work.” This should be dispositive as to any further analysis given the well-

 established deferential standard of review that this Court is required to apply. But,

 the majority again impermissibly speculates and draws its own inferences from the

 cold record rather than deferring to the findings of the trial court. In so doing, the

 majority encroaches on the authority vested in the trial court.

¶ 146 To be sure, “[e]qual justice under law requires a criminal trial free of racial

 discrimination in the jury selection process.” Flowers, 139 S. Ct. at 2242, 204 L. Ed.

 2d at 655. But this Court is not equipped, nor is it our role, to find facts and weigh

 evidence. Even if one were to assume this is a close case, which it is not, “where there

 are two permissible views of the evidence, the fact-finder’s choice between them
 STATE V. CLEGG

 2022-NCSC-11

 Berger, J., dissenting

 cannot be clearly erroneous.” State v. Thomas, 329 N.C. 423, 433, 407 S.E.2d 141,

 148 (1991) (quoting Anderson v. Bessemer City, 470 U.S. 564, 574, 105 S.Ct. 1504,

 1511, 84 L.Ed.2d 518, 528 (1985)); see also Hobbs, 374 N.C. at 366–67, 841 S.E.2d at

 508 (Newby, J., dissenting).

 III. Conclusion

¶ 147 From its unique position, the trial court observed the strikes of Ms. Jeffreys

 and Ms. Aubrey and heard the explanations for the strikes offered by the State. In a

 comprehensive order, the trial court made detailed findings of fact and conclusions of

 law, ultimately overruling defendant’s objections to the peremptory strikes. The

 majority, however, declines to give the trial court any measure of deference, adopting

 its own view of the evidence. In so doing, the majority ignores the caution advised by

 the Supreme Court that “mistaken explanations should not be confused with racial

 discrimination.” Flowers, 139 S. Ct. at 2250, 204 L. Ed. 2d at 663.

 Chief Justice NEWBY and Justice BARRINGER join in this dissenting

 opinion.